OF THE

## STATE OF MISSOURI

AT THE

APRIL TERM, 1912.

---

(*Continued from Volume 243*)

---

'ANNIE L. POWER, Appellant, v. WABASH
RAILROAD COMPANY.

In Banc, June 10, 1912.

1. **NEGLIGENCE: Master and Servant: Injury to Servant: Question for Jury.** Whether a railroad company was negligent in failing to light a trestle which stood between the spot where the company's employees were clearing away a wreck at night, and the diner where they had to go for food, is, under the circumstances of this case, a question for the jury.

2. ――――: ――――: ――――: **Contributory Negligence.** Employees of a railroad company had spent the afternoon clearing away a wreck near a trestle. The work train, with the diner and other cars, had been on the same side of the trestle as the wreck, but the position of the cars changed frequently. Night fell and at 8:30, after it had grown very dark, several workmen started for supper, knowing that then they had to cross the trestle to reach the diner. They stepped off the track to go around a car, and one of the men fell to his death from the fill of the trestle. *Held*, that the question whether deceased was guilty of contributory negligence was for the jury.
   *Held*, by BLAIR, C., dissenting, with whom LAMM, GRAVES and FERRISS, JJ., concur, that, since deceased knew the

risk, but elected to proceed toward the trestle in the dark, along the side of the car, on the assumption that the trestle was farther west than it was, he was guilty, as a matter of law, of contributory negligence.

3. ———: **Question for Jury.** Where different inferences may fairly be drawn from the undisputed facts, the question of negligence should be submitted to the jury.

Appeal from Gentry Circuit Court.—*Hon. W. C. Ellison,* Judge.

REVERSED AND REMANDED.

*E. E. Aleshire, R. P. Duncan, R. S. Robertson* and *S. S. Gundlach* for appellant.

The only question we think involved in this case is whether or not the defendant was guilty of negligence and whether or not the deceased was guilty of contributory negligence. The answer pleads contributory negligence and assumption of risk. We do not think the latter defense can have much to do with the case. It is an elementary principle of law and decided scores of times in Missouri that a servant never assumes the master's negligence. As the court gave a peremptory instruction in this case at the close of plaintiff's evidence, all of the testimony has been printed. To sustain our position that the court erred in giving the peremptory instruction we herewith submit the following authorities: Walch v. Trans. Co., 52 Mo. 434; Stevens v. Walpold, 76 Mo. App. 213; Butts v. Bank, 99 Mo. App. 168; McClain v. Railroad, 100 Mo. App. 374; Burkhardt v. Schott, 101 Mo. App. 465; Mitchell v. Railroad, 132 Mo. App. 143; Wiley v. Gas Co., 132 Mo. App. 380; Moellman v. Lumber Co., 134 Mo. App. 485; Crawford v. Stockyards, 215 Mo. 394; Matz v. Railroad, 217 Mo. 275; Holman v. Iron Co., 133 S. W. 379; Dewire v. Bailey, 131 Mass. 169; Railroad v. Johnson, 69 Kan. 721; Railroad v. Martin, 41 Mich. 667; City v. Hoffman, 74 Ill. App.

503; Home v. Mining -Co., 75 Pac. 381; McCarty v. Morse, 197 Mass. 332; D. G. Co. v. Carr, 85 Ark. 479; Gordon v. Cummings, 152 Mass. 513; Tel. Co. v. Union, 131 Ill. App. 248; Finnegan v. Mfg. Co., 189 Mass. 580; Railroad v. Ives, 144 U. S. 408; Frost v. McCarty, 200 Mass. 445.

*J. L. Minnis* and *J. W. Peery* for respondent.

(1) The rule which requires the master to exercise ordinary care in providing his servants with a reasonably safe place in which to work, does not apply to the character of work which was being done in this instance, nor to the circumstances of this case. As shown by the evidence, the work was being done in clearing up a wreck and repairing a track in the night-time. In such cases, the servant assumes the increased hazard attending the particular work under all of the surroundings. Meehan v. Railroad, 114 Mo. App. 396; Railroad v. Henderson, 134 Ind. 636; Railroad v. Jackson, 65 Fed. 48; Hanson v. Armour Co., 113 Mo. App. 618. (2) The leaving of the truck car upon the trestle or culvert, being in the usual course of business, and one of the incidents of the work in which the deceased, with the other men were engaged at the time, was not negligence on the part of the defendant. The evidence shows that the wrecking train was necessarily moved back and forth, up and down the track, all the afternoon; and a part of the time during the afternoon was standing upon this trestle. The moving of the train for the purpose of taking off material, and permitting passenger trains to exchange mail, was all a part of the work in hand, and all of which was well known to the deceased. Jackson v. Railroad, 104 Mo. 456; Thomas v. Railroad, 109 Mo. 187; Ring v. Railroad, 112 Mo. 230. (3) There was no absolute obligation on the part of the defendant to look after and take care of the section men engaged in this work, and the failure to do so was not negligence. Sissel v. Railroad,

214 Mo. 515; Nivert v. Railroad, 232 Mo. 626. (4) The fact that deceased knew all about the culvert or trestle and the underground crossing over which it was constructed, and that his attention was directly called to it, and he was warned of it just before the accident, shows that he was guilty of such gross negligence and recklessness as to prevent a recovery. Sissel v. Railroad, 214 Mo. 514; Price v. Railroad, 77 Mo. 510; Thomas v. Railroad, 109 Mo. 199; Hitz v. Railroad, 152 Mo. App. 687; Hirsch v. Bread Co., 150 Mo. App. 162; Roberts v. Tel. Co., 166 Mo. 370; Loeffler v. Railroad, 96 Mo. 267; Gleeson v. Mfg. Co., 94 Mo. 201; Kenneddy v. Friederich, 61 N. E. 642-643; Weller v. Gas Co., 91 N. E. 286-287; Railroad v. Samuels, 123 S. W. (Tex.) 121; Railroad v. Baldwin, 164 Fed. 826. (5) The want of sufficient light, or of its being dark, does not excuse the gross negligence of the deceased. The evidence shows that there were both torches and lanterns at the place of the wreck and he could have supplied himself with one or the other; but aside from that, he knew that it was dark, and the darkness was simply an incident of the work in which he was engaged. Nickerson v. Railroad, 144 Mo. App. 401; Anderson v. Box Co., 103 Mo. App. 382; Boymer v. Packing Co., 106 Mo. App. 726; Price v. Railroad, 77 Mo. 510; Railroad v. Jackson, 65 Fed. 48.

ROY, C.—This is an action for damages on account of the death of plaintiff's husband, Alonzo Power, tried in the Gentry county circuit court, where, on a peremptory instruction in the nature of a demurrer to the evidence, there was a verdict for defendant and plaintiff has appealed.

The deceased had been employed as a section hand of defendant almost two years, working on the section at Stanberry. On October 25, 1907, a freight train of twenty-nine cars was wrecked about twenty-two miles east of Stanberry, just east of what is known as the

"curve trestle," tearing up a large portion of the track. The west end of the torn-up track was so close to the trestle that the men, including the deceased, unloaded ties and rails during the afternoon within sixty feet of the trestle and carried them down the track to the place where they were needed. The wrecking train, consisting of a dining car, a truck car and a supply car, carrying the plaintiff's husband and a large number of other section men picked up from Stanberry along the route, reached the wreck about half past one in the afternoon. From that time all was quick and rapid action. The cars were shifted from point to point, and left standing as the exigencies of the work required. Near five o'clock the work train was run four or five miles back to McFall in order to let trains from the east and west transfer passengers and mail at the wreck. Then the work train went back to its work, reaching there probably a little late for supper.

The trestle was about twenty feet long, under which was a farm crossing, with precipitous sides, apparently a ravine about twenty feet deep. There was no railing along the sides of the trestle and no guards at the end. When night came on it was misting rain and at eight-thirty o'clock was, of course, very dark. Neither the cars nor the trestle were marked with lights. The glimmer from bonfires, torches, and probably an occasional lantern from the eastward revealed the dim outline of cars on or near the trestle, but did not show the trestle, or bank. Several workmen had torches, and some of them used torches in going to and from supper.

From the time the train had returned from Mc-Fall, the workmen, from time to time, as their work would permit, had been going in squads of four or five to their supper which was served in the dining car standing west of the trestle. In the meanwhile the train including the dining car was shifted from time to time. So far as the evidence shows, the workmen

who had gone to supper before Power started, had all passed over the trestle without being obstructed by a car thereon. Two of them with a torch had returned over the trestle from supper to where Power was working just before he started to supper.

About half after eight Power, accompanied by Cogdill, Wilson and Gray, his fellow workmen, started to supper. Cogdill and Wilson were witnesses for the plaintiff, but they differed radically in their testimony. Cogdill says that they walked on the outside of the ties in going along the track to their supper, giving as a reason for so doing as follows, ''well, it is a whole lot easier walking out there than it is stepping from one tie to the other.'' Wilson testified that they were all walking between the rails on the track, and that when they reached the cars, Power and Cogdill stepped off the north side of the track, and he and Gray off the south side. All started around the cars. At that time one of the cars was standing partly on the trestle and partly east of it. It had not been there over thirty minutes. Some workmen with a torch had returned from supper over the unobstructed trestle to where Power was at work just before Power and his companions started. The dining car was further on west.

All six of the plaintiff's witnesses, who were all at the wreck, testified that they knew about the trestle; and four of them said that Power worked at times within sixty feet of the trestle. The deceased had no knowledge of the vicinity, except what he acquired on that occasion. The principal part of the wreck was about three hundred and sixty feet east of the bridge.

Cogdill testified as follows: ''Q. I will ask you to tell the jury whether you walked up to supper with Mr. Powers that evening or started to? A. Yes sir. I walked up on the north side of the track—on the cinders. We wasn't on the ties. The truck car was on the culvert, and the supply car, with rails and ties, was east. Before we got to the culvert, recollect, I said

to Lon—I said: 'Lon, there is a bridge here some place, but I don't know where-abouts.' I knew there was a bridge there, and so did he. He says: 'Well, you follow me.' Of course I won't make the remarks he did. He said: 'You follow me and I will take you through all right.' Well, he hadn't any more than got the words out of his mouth until he fell. Well, I stepped on the block he fell off of. I come that near falling.

"Q. At that time, you didn't know you were that close to it? A. I didn't know we were that near the culvert.

"Q. And he didn't either? A. If he did, he wouldn't have fell.

"Q. If you had been in front of Mr. Powers, this accident would occurred to you?

"By Mr. Perry, Counsel for Defendant: Hold on, I object. A. I don't know whether it would or not, because—

"By the Court: Hold on. When an objection is made, you must keep quiet until I pass on it.

"Q. Well— A. I'll tell you, Mr. Showen, if he hadn't knowed the road so well, I wouldn't have followed him. But he knew where he was going. But I didn't. I knew there was a bridge there, and I was going to take care of myself. I wouldn't have went just then. There was nobody told us to go to supper at all."

Wilson testified as follows:

"Q. Tell the jury, then, just how he went and all about it, up to the time of this accident. A. There was Harry Gray and myself and Mr. Cogdill—William Cogdill—and Mr. Powers started up the track to the dining car. We came to those cars, and we stepped off—Harry Gray and myself stepped off on the south side of the track, and Mr. Cogdill and Mr. Powers on the north side, and, about that time, I spoke to Harry and told him we were getting somewhere near that

culvert. I couldn't tell just where. He stopped and
he said, 'Yes.' I heard a man fall then. About that
time, Mr. Cogdill called to Mr. Powers, he didn't an-
swer him, and I says: 'Mr. Powers fell in that cul-
vert.' ''

The petition was broad enough to cover all phases
of the evidence and the answer is a general denial, and
also a plea of contributory negligence and the assump-
tion of risk.

I.  Let it be conceded for the purposes of this case
that it was not negligence on the part of the company
to have no rails or guards at the trestle; and also that
it was not negligence under the circumstances to let the
car stand on the trestle as shown in evidence. We do
not undertake to pass on those questions, but concede
them in order to get right at the main points in this
case, i. e.: Were the circumstances in evidence such as
to authorize a jury to find that the defendant was negli-
gent in failing to mark the location of the trestle by
a light or lights so that passing workmen would see
the embankment and not fall over? And is the evidence
such that the trial court was justified in holding as a
matter of law that the deceased was guilty of such
contributory negligence as prohibited plaintiff's recov-
ery?

The changes along and on that railroad track at
the scene of the wreck, after the work of reconstruc-
tion began had been kaleidoscopic. The track was be-
ing reconstructed, wrecked cars were being removed.
Old land marks were constantly disappearing and new
ones taking their places. Daylight was gone and the
clouds and rain intensified the darkness. The flicker
of distant lights revealed prominent objects, such as
cars, in dim outline, but intensified the darkness at
their feet. There is nothing to show from what point
deceased started to supper; but, supposing he went
from the point of the principal damage, he had over a

hundred yards to go before reaching the trestle. Power knew about the trestle; but there is no showing that there was any object near the trestle by which the attention of one passing by would be called to it. Did he think that the trestle was beyond the car and that it was unobstructed for passage? Such a conclusion may be drawn from the evidence. If the evidence showed that he knew the relative position of the car and the trestle, of course it was fatal negligence in him to proceed as he did. Evidently the men could not see the trestle or the passage under it even a step in front of them. The very facts relied on by defendant as showing contributory negligence bear the opposite construction. When they started around the car Cogdill said to Power, "Lon, there is a bridge here some place, but I don't know where-abouts." Power said, "You follow me and I will take you through all right," and at once fell to his death; and Cogdill, alert as the evidence shows he was, would doubtless have fallen if Power had not.

The evidence of Wilson shows that he and Gray might have fallen if they had not at the moment heard Power fall.

Counsel for defendant cite Thomas v. Railroad, 109 Mo. 1. c. 199, where it is said in speaking of the workmen, "He must not go blindly and heedlessly to his work, when there is danger. He must inform himself. This is the law everywhere." That is certainly law which no one doubts. But suppose he did just twenty or thirty minutes before ascertain that the trestle was clear and that one car was east of the trestle and the others, including the dining car, were west of the trestle, and suppose that, under all the circumstances, he reasonably believed that the situation in that respect remained unchanged, would not his act be based on what he supposed was actual knowledge that the way was safe? When he said "Follow me, and I will take you through all right" he may have been

acting carelessly, or he may have been acting from a reasonable conviction that the danger was not at their feet, but that the unobstructed trestle was further on.

Neither do we think that Railroad v. Jackson, 65 Fed. l. c. 50, is like this case. That was a case of tearing up, moving and relaying a portion of the track which was in danger of being washed into the river by high water. It was held that the workman had no reason to suppose that the right of way where he was at work would be kept free at every moment from all such impediments as might cause him to lose his footing.

In this case the dangerous condition was not in that part of the road being reconstructed. The condition of the trestle and the crossing was not being changed. It remained untouched by the work that was going on. It was between the workmen and their supper; a situation created by the defendant. A lantern hung at nightfall on or near the trestle would have prevented all mistakes.

Counsel for appellant in their printed argument say that deceased had worked in sixty feet of the trestle all that afternoon. The record shows that at times he did so work, but that he was in a work which took the workmen along the track the full length of the wreck. If it were a fact that he worked all afternoon in sixty feet of the trestle, we could presume he started for his supper from the point where he was at work and then knew that the trestle was about sixty feet in front of him. In that case the contributory negligence would be evident enough. But the evidence shows that he worked all along the line of the wreck, and may have had the full distance to go to his supper. It may be that without being negligent, he miscalculated the distance he had to go to the trestle. He may have been depending on some landmark that had disappeared or had changed its position, as, for instance, the car. His

last words clearly show that he was confident that the trestle was further ahead than it was.

In Huhn v. Railroad, 92 Mo. 1. c. 450, it is said that where different inferences may be fairly drawn from the undisputed facts, the question of negligence should be submitted to the jury. See also Paden v. Van Blarcom, 181 Mo. 1. c. 128; Powers v. Transit Co., 202 Mo. 1. c. 280; Railroad v. Ives, 144 U. S. 417.

The cause should not have been taken from the jury.

The judgment is reversed and the cause remanded. *Blair, C.,* not concurring.

PER CURIAM.—This case coming into Banc from Division Two on the dissent of *Ferriss, P. J.,* was heard in Banc and the opinion of Roy, C., was adopted by the court. *Valliant, C. J., Woodson, Kennish* and *Brown, JJ.,* concur—*Woodson, J.,* in separate opinion. *Graves* and *Ferriss, JJ.,* dissent, adopting therefor the divisional opinion of *Blair, C.,* in which *Lamm, J.,* concurs in a separate opinion filed.

## CONCURRING OPINION.

WOODSON, J.—I concur in the opinion written in this case by Roy, C., in division, not only for the reasons stated by him, but also for the reason that the testimony of Wilson, who testified for appellant, shows that Powers, the deceased, was walking between the rails and not on the north side of the track, until he reached the car, standing partially upon the trestle and partially east of it, and then stepped from between the rails to the north and upon taking a step or two west, fell into the culvert and sustained the injuries which resulted in his death.

This evidence considered in connnection with that stated in the opinion, shows conclusively that Powers, at the time, believed said car was standing between

him and the trestle, and that he intended to pass by it, on the north side, and approach the trestle somewhere west of the west end of the car, pass over it, and then proceed to the diner.

Upon that state of facts, I think men of ordinary prudence might have drawn different inferences as to the danger or safety attending an attempt to pass over the trestle under the facts and circumstances disclosed by this record.

## DISSENTING OPINION.

BLAIR, C.—This is an appeal from a judgment entered on a verdict for defendant which the court directed the jury to return at the close of plaintiff's evidence in an action for damages for the death of Alonzo Power, who succumbed to injuries resulting from a fall off the top of a fill at the end of a trestle over a farm crossing near McFall, Missouri.

The allegations of the petition were considerably broader than the evidence (hereafter stated) offered to support it, and the answer consisted of a general denial and pleas of contributory negligence and assumption of risk.

Power was a section hand and had been in defendant's employment in that capacity for a year and nine months and in other capacities had worked for the same company some three months. The section gang with which he worked had head-quarters at Stanberry, and on October 25, 1907, a freight train consisting of twenty-nine cars was wrecked at a point about twenty-two miles east of Stanberry, about four and one-half miles east of McFall and a short distance east of a trestle, known as the "curve trestle," spanning a farm crossing. This trestle was about twenty feet above the roadway which ran beneath it. The wrecker left Stanberry about twelve m. on the day mentioned. It consisted of the wrecking car, engine and tender,

supply car, tool car and dining car, in the order named, and carried the section men from Stanberry and intervening sections down through McFall to the wrecked train. Other section men from Pattonsburg, the next town east of the wreck, also assisted in the work of clearing the track, which was torn up for one hundred and twenty feet.

The train arrived at the wreck about one thirty p. m. The engine and wrecking car carrying the derrick were detached from the rest of the train and proceeded to the wrecked cars, leaving the truck car or tool car, supply car and dining car near the trestle, some three hundred and fifty feet west of the wreck. As ties and rails were needed during the afternoon and evening the supply car was resorted to and materials desired were unloaded therefrom some sixty feet east of the trestle and carried by the section men east to the place where they were to be used. Power assisted in this work in the afternoon and probably in the evening, and worked for some time in plain view of the trestle and within sixty feet of it. He had crossed the trestle in daylight going to his place at the wreck, but whether on foot or on one of the cars does not appear. The men had no fixed duties but did whatever the exigencies of the constantly changing situation demanded. The truck car, supply car and dining car were sometimes west of the trestle, sometimes on the trestle, and sometimes nearly or quite east of it, being moved about as the necessities of the work at the wreck required.

The engine and wrecking car, commencing at the west end of the wrecked train, worked backward and forward along the wreck clearing away cars and the section men unloaded cars, burning those which were badly damaged.

During the evening the truck car, supply car and dining car were pushed backward and forward and, according to the evidence, "they had them up and down,

unloading rails.'' The engine and wrecker ''generally worked backward and forward from the wreck, tolerably close to these cars, dragging back the rubbish.'' The other cars were ''left up somewhere near that bridge (trestle) until they got ready for the supplies—rails and ties—and then they were pulled down there'' and what was needed was unloaded and then the cars were ''shoved back up there.''

Late in the afternoon the wrecker, engine and cars, ran back west to McFall and remained there while an east bound passenger train proceeded to the place of the wreck, exchanged passengers, mail, etc., with a west bound passenger train, and returned to McFall. The wrecking train then returned to the wreck and the work proceeded as before, the engine and derrick car or wrecker being detached from the supply car, tool car and dining car, and this last left west of the trestle. Whether the truck car and supply car were then left west of the trestle or detached from the dining car and pulled down east of the trestle does not appear.

Darkness then had fallen and it was a cloudy, drizzly night. The section men went back to the dining car for supper as they could get away, by twos and threes and fours, the accommodations not being sufficient for all at one time, and the work at the wreck proceeded without interruption. Some of the men who went to supper before Power started carried lights and some did not. Two who went to the dining car and returned about thirty minutes before Power started found no cars on the trestle at either time they crossed it. Bonfires were burning near the wreck, but there was no fire or light at the trestle. The trestle itself had no guard rails and in that respect was like all others of its kind. The only testimony on this point is that of a section hand who said he had never seen a trestle of the kind with guard rails.

Between eight and nine o'clock, Power, William Cogdill, Mose Wilson and Harry Gray started from

the wreck back to the dining car for supper. Cogdill relates what happened as follows:

"Q. I will ask you to tell the jury whether you walked up to supper with Mr. Powers that evening, or started to? A. Yes, sir. I walked up on the north side of the track—on the cinders. We wasn't on the ties. The truck car was on the culvert, and the supply car, with rails and ties, was east. Before we got to the culvert, recollect, I said to Lon—I said: 'Lon, there is a bridge here some place, but I don't know where abouts.' I knew there was a bridge there, and so did he. He says: 'Well, you follow me.' Of course I won't make the remarks he did. He said: 'You follow me, and I will take you through all right.' Well, he hadn't any more than got the words out of his mouth until he fell. Well, I stepped on the block he fell off of. I come that near falling.

"Q. At that time, you didn't know you were that close to it? A. I didn't know we were that near the culvert.

"Q. And he didn't either? A. If he did, he wouldn't have fell.

"Q. If you had been in front of Mr. Powers, this accident would occurred to you? A. I don't know whether it would or not, because—I'll tell you, Mr. Showen, if he hadn't knowed the road so well, I wouldn't have followed him. But he knew where he was going. But I didn't. I knew there was a bridge there, and I was going to take care of myself. I wouldn't have went just then. There was nobody told us to go to supper at all.

"Q. You say you walked on the cinders. What do you mean by that? A. Along the dump.

"Q. That is, on the middle of the track? A. No, sir. It is on the outskirts of the rails—of the ties.

"Q. Why did you walk out there? A. Well, it is a whole lot easier walking out there than it is stepping from one tie to the other.

"Q. Was there anything to warn you people that this car was standing half on the bridge and half on the track or the road-bed? A. No, I don't know as there was. We wasn't looking for such as that. We was hunting our suppers.

"Q. Well, state to the jury whether or not you and Mr. Power— A. Well, I knew the bridge was there.

"Q. Wait until I ask the question—had any information as to the fact that that car stood half on the bridge and half on the track just east of the bridge, at that time. A. Well, we knew that the dining car was west of the bridge. There is where we were working for.

"Q. But you don't answer my question. Read the question, Mr. Stenographer."

Thereupon, the last question propounded to the witness by counsel for plaintiff was read to him by the stenographer, in the words and figures following, to-wit: "Q. Well, state to the jury whether or not you and Mr. Power had any information as to the fact that that car stood half on the bridge and half on the track just east of the bridge, at that time. A. Oh, no, I didn't know where the car stood, as far as that is concerned.

"Q. I will get you to tell the jury whether it was dark or not, at that time? A. Well, it was.

"Q. Well, what was the condition of the atmosphere? Raining? A. It was cloudy and misting."

On cross-examination this witness testified as follows:

"Q. Now, Mr. Cogdill, you and Mr. Power both had worked up there near this bridge that afternoon, hadn't you? A. Yes, sir. We had been all along there.

"Q. In plain sight of it, hadn't you? A. Yes, sir. Not over two rails' length from the culvert.

"Q. Not over two rails' length from it. You

could see the bridge and could see the ravine there?
A. Oh, yes.

"Q. You knew there was a place there? A. Oh,
yes, I knew it.

"Q. And you were back and forth, up and down
that track, carrying rails and material, all that after-
noon? A. Yes, sir.

"Q. And when you got up here to where these
two cars were standing, you could see the outlines of
the cars on the track, couldn't you? A. Of course you
could see them.

"Q. The truck car and the supply car? A. The
supply car and the truck car.

"Q. Of course you couldn't see the bridge? A.
Oh, no.

"Q. Now this wasn't really a bridge? A. I
could call it a culvert.

"Q. It was an underground farm crossing, and
it was out in the country? A. Yes.

"Q. And it didn't have any guard rails? A. No,
sir.

"Q. You never saw a bridge or a railroad cross-
ing of that kind with guard rails, did you, out in the
country? A. I never did.

"Q. Now then, nobody didn't order you and Mr.
Power to go to supper? A. Oh, no. No.

"Q. You went of your own accord? A. Of our
own accord.

"Q. Now, when you got up here to where you
could see the outline and could see this truck car and
this supply car, and were walking along the side of
them there, you said to Mr. Power: 'Lon, look out!
There is a bridge here somewhere.' A. That is what
I did.

"Q. And he says, 'You follow me, and you will
be all right.' A. Yes, sir. That is just the very words
that he made.

"Q. And, just after he had said that—just after he had said that, he took one or two steps and fell? A. Yes, sir.

"Q. Now men had been going back and forth there all evening to their suppers, hadn't they?"

"By the Court: Do you mean evening or afternoon, Mr. Peery?

"By Mr. Peery, Counsel for Defendant: I meant evening. After night.

"A. Yes, sir. There had been several down and back.

"Q. Your boy had been up there and got his supper? A. Yes.

"Q. Now this truck car and this supply car were standing there in this same position before it got dark, were they not? A. They were there.

"Q. You had seen them standing there the last time you had seen them? A. Yes, sir. Yes, sir. Of course we was here, there and every place else. Where we was called is where we had to go to work.

"Q. Yes. But the last time you had seen this supply car and this truck car, they were there on that bridge, in that same position? A. Yes, sir.

"Q. Now the light from the derrick that you had down here to work by was not sufficient to show the bridge and this ravine, was it? A. Oh, no. Oh, no.

"Q. But it did show the outlines of these two cars? A. Oh, yes. You could see the cars.

"Q. How? A. You could see the cars.

"Q. You could see the cars when you got up there? A. Yes. But you couldn't see anything else.

"Q. And you and Mr. Powers were not on the track at all? A. Oh, no.

"Q. You were on the dump? A. We were on the dump—on the cinders.

"Q. On the cinders all the time? A. We were walking along on the cinders. Yes.

"Q. Are you working for the company now? A. No, sir. I hain't."

Wilson's testimony concerning the matter was as follows:

"Q. I will ask you to tell the jury whether or not you started to supper in the same bunch with Mr. Powers. A. Yes, sir.

"Q. Tell the jury, then, just how he went and all about it, up to the time of this accident? A. There was Harry Gray and myself and Mr. Cogdill—William Cogdill—and Mr. Powers started up the track to the dining car. We came to those cars, and we stepped off—Harry Gray and myself stepped off on the south side of the track, and Mr. Cogdill and Mr. Powers on the north side, and, about that time, I spoke to Harry and told him we were getting somewhere near that culvert. I couldn't tell just where. He stopped, and he said, 'Yes.' I heard a man fall then. About that time, Mr. Cogdill called to Mr. Powers, he didn't answer him, and I says: 'Mr. Powers fell in that culvert.' We got down the dump and got to where we could get over the fence into the roadway, and we went under the railroad. We started to him. I told Harry to go back and get the lantern, and he started back, and someone came in with a lantern before he came back—come in and struck a match first. Some fellow. I don't know who it was. And we found him. I went to him. The lantern come pretty soon, and we picked him up, with lanterns and torches. There was several come, in a few minutes. We took him to the car and loaded him.

"Q. Was it very dark, or otherwise? A. It was pretty dark.

"Q. Could you see this car until you got to it? A. We could see the bulk of it off some distance. Yes.

"Q. In coming up to that car, you were between the rails, in the middle of the track? A. Yes, sir.

"Q.   Two of you went to the right and two to the left?   A.   Yes, sir.

"Q.   I will ask you to tell the jury if you heard any conversation there by this deceased, Power, stating that there was a bridge there that he knew of, or anything that Mr. Cogdill testified to?   A.   I didn't pay any attention to it.   No.

"Q.   Did you hear any such talk as that?   A. I don't know as I did.

"Q.   The first time you heard of any bridge mentioned was when your partner, Mr. Graham, mentioned it?   A.   I spoke to Mr. Gray.

"Q.   Mr. Gray?   A.   They were on one side of the car, and me on the other.

"Q.   You didn't know when you were going up there that that bridge stood on—that that car stood on the bridge, until you got up to it, did you?   A. No, sir. I hadn't paid any attention to it.

"Q.   As a matter of fact, the cars that had been up in that part had been down a couple of rails' length east of the bridge in the evening, hadn't they?   A.   Oh, they might have been.   I didn't pay any attention to them.

"Q.   Do you know anything about how they came to be there?   A.   They unhooked from them and left them there, I suppose.

"Q.   I will ask you to tell the jury whether it is a fact, or not, that the train-men were jamming those cars back and forth, up and down the track, to suit their convenience, all evening, and not leaving them standing in one place?   A.   Oh, they made repeated trips to McFall and back.

"Q.   They changed the cars around in different places all evening?   A.   Yes, sir."

On cross-examination, he testified as follows:

"Q.   Mr. Wilson, you assisted that afternoon in unloading rails and ties from this supply car up near this bridge, didn't you?   A.   Yes, sir.

"Q.  And in plain sight of it?  A.  Yes, sir.

"Q.  And you saw Mr. Power there, didn't you? A.  Yes, sir.

"Q.  Assisting in that work?  A.  Yes, sir.

"Q.  And he was in plain sight of this bridge over this underground crossing?  A.  Yes, sir.

"Q.  That afternoon.  And as you men came up, going to supper, when you got up near these cars here, it was light enough that you could see the bulk of the cars and could see that they were there on the track, wasn't it?  A.  Yes, sir.

"Q.  And that light came from the lights that were further down the track east, towards the wreck and the derrick?  A.  I don't know whether that light had any effect up there, or not.

"Q.  At all events, it was either that light, or else—  A.—The sky light.

"Q.—Or the sky light—one or the other.  You could see the bulk of the cars in front of you and see they were on the track?  A.  Yes, sir.

"Q.  Thereupon, you and Mr. Gray went to the south or to the left and Mr. Cogdill and Mr. Power went to the north?  A.  Yes, sir.

"Q.  And there was these two freight cars between you?  A.  Yes, sir.

"Q.  And you said to Mr. Gray, 'Look out for this trestle or this culvert?'  A.  Yes, sir.  I spoke something about the culvert.

"Q.  And you don't know what conversation occurred between Mr. Cogdill and Mr. Power, on the other side of the car, on the other side of the track, do you?  A.  No, sir. I didn't pay no attention to that."

Gray did not testify.

Railings on a trestle constructed over a farm crossing four miles in the country are not required or practicable in view of the use for which such trestle is designed and the lack of them does not tend to prove negligence in the circumstances of this case; further, de-

ceased did not fall by reason of the lack of such railings on the trestle and did not fall from the trestle at all, but fell from the top of the fill or abutment at the end of the trestle. The lack of railings had nothing to do with the injury.

Deceased knew of the existence of the trestle and that it was in the path he was following. He knew when he reached the truck car that he had not yet crossed the trestle and that both the trestle and dining car were ahead of him. He also knew that he could not continue indefinitely the course he was pursuing without falling into the roadway beneath the trestle. He knew that he was proceeding in the dark toward the trestle, and that there was no light marking its position, and was relying entirely on his own knowledge of the situation. He chose both the time he would go and the route he would take, and was master of his own movements, so far as orders were concerned, while making his way to the dining car. He undoubtedly assumed that the trestle was farther west than it was, and walked confidently along beside the track and truck car, assuring his companion he "would take him through all right" when the latter suggested they were approaching the trestle.

Deceased was bound to take notice of the changes at the wreck and the consequent increase or diminution of the distance of the west end of the wrecked train from the trestle because the only business he had there was to aid in bringing about those very changes until the entire wreck was cleared away and the track rebuilt. He was bound, also, to know that the truck car, supply car and dining car were not only not immovable but that their position was being changed as materials were needed and as the engine and wrecker pulled them down across and pushed them back to or beyond the trestle. He had himself been aiding in the work of unloading materials from the supply car.

Deceased knew that he was walking in the dark·

ness along a path which must, if followed as far as the trestle, lead off the abutment and result in his falling, there being no possible way to get safely across the roadway on the pathway he was pursuing.

Cases in which recoveries have been upheld for injuries resulting from unblocked guard rails, defective and slippery sidewalks and passageways, uncovered hatchways, etc., are cited by counsel. None is in point. In those cases it was not impossible for the employee to continue his labors without injury, while in this case injury from following the path deceased was traveling was as certain, if followed far enough, as the operation of the law of gravitation. This is not a case in which an employee fell into a negligently uncovered hatchway or opening in a passageway provided for his use, or platform on which he is put at work. Here there was no possibility of getting safely across the roadway unless deceased changed his route, got upon the track or cars or went down the fill and across the fences and thus around the trestle. Deceased knew the risk but elected to proceed toward the trestle in the dark, along the side of the car, on the assumption that the trestle was farther west than it was, knowing that if he had miscalculated the result would be what it was.

The case must rest upon its own peculiar circumstances and in view of them the trial court was right in holding that the deceased's own negligence was the proximate cause of the injury and that there was no question for a jury to determine. Though plaintiff be given the benefit of every reasonable inference fair minded men might draw from the evidence adduced, there is no theory which would warrant a recovery. The authorities cited in the briefs lay down the principles by which this case must be ruled.

The judgment ought to be affirmed, therefore I dissent from the opinion of *Roy, C.*

The foregoing opinion of *Blair, C.,* is hereby

adopted by *Graves* and *Ferriss, JJ.*, as their dissenting opinion in this case.


## DISSENTING OPINION.


LAMM, J.—I dissent from the principal opinion of Commissioner ROY and concur in the opinion of Commissioner BLAIR and put my vote on the ground that Power was guilty of contributory negligence as a matter of law. Let it be conceded, for argument's sake, that defendant was negligent in blocking in the night time the only safe passageway to the dining car by placing a car over the trestle and providing no temporary light there, yet the circumstances being out of the ordinary, there being a wreck and a sudden emergency, with cars ·shifting here, and there constantly, decedent had no right to rely on a permanent location of the dining car at any certain place on the track, or at any given point bearing a certain permanent relation in distance to the ravine, or to any other car of the wrecking train. Things in that regard shifted every now and then and had to shift, all of which decedent knew. The dining car might be on one side of the ravine at one time and on the other at another. Decedent knew that. He knew, too, of the dangerous embankment and ravine. There is no testimony that he cared for a torch, or asked for a light and was refused one or that he could not have had a torch for the asking. In this condition of things, he set out on his journey in the nighttime without a light, knowing that a car of the train might be between him and the dining car, and, what is more, might stand either over or on one side or the other of the ravine. While on that journey he came to such car. Observe, he knew he was close to the trestle and the embankment leading to it. His attention was jogged in that particular. Forewarned on that fact, he took his own course for it.

We are not left to guess about that matter. We know from the testimony not only that he trusted solely to his own judgment and not his master's judgment, but that he was willing to do so. The master had given him no advice on the point, decedent asked for none, he stepped out into the darkness and met his death. Why? Because his judgment was wrong on a point he chose to decide for himself. No man should have taken the risk he did in the presence of deadly peril he knew was lurking close by in the dark, without shouldering the responsibility for the result. In taking that risk voluntarily and after a warning, it seems to me it ought to be at his own and not his master's risk. It was a leap in the dark indeed. I lay no stress on the fact that decedent was not asked to go to supper. Men must eat. Defendant knew those men would get hungry and arranged accordingly. But something must be allowed to the hurry, the emergency, the darkness and decedent was bound to act with ordinary prudence before his widow can call on the master to respond in damages for negligence. When employers are made liable without regard to negligence, or contributory negligence, as contemplated in legislation now bruited and being hammered out on the anvil of·public discussion, it will be time enough for courts to take that view of it. For the present we should enforce the law as it is, not as it isn't.