# MARY ROLLISON, Appellant, v. WABASH RAILROAD COMPANY.

**In Banc, November 24, 1913.**

1. **NEGLIGENCE: Country Crossing: Duty of Railroad.** In applying the law of negligence relating to statutory signals at public road crossings outside of cities, the duty of the railroad company is performed when it provides a bell on its locomotive, rings it eighty rods from the crossing and then keeps it ringing until the locomotive has crossed the public road; or a steam whistle on such locomotive must be sounded at least eighty rods from the crossing and thereafter sounded at intervals until the locomotive has crossed the public road. The company can do one or the other; it is not required to do both.

2. ———: ———: ———: .To do Both: Humanitarian Rule. The rule, shifting and measured by circumstance, is that it is the duty of the railroad company, whose train is about to cross a public road outside of a city, to alarm with a whistle, when the stroke of the bell is plainly ineffective to arrest the attention of a person who has (negligently or not) put himself in peril. of which he is apparently unconscious and of which the driver of the locomotive is conscious;. that duty is, under such circumstances, an essential part of due care and of the humanity rule. But even then plaintiff can recover only by showing defendant was negligent in not giving timely warning by whistle. And the bell being kept ringing for eighty rods from the crossing, if the evidence shows that the engineer gave the whistle alarm as soon as his eye saw and his mind could conceive the situation and his hand grasp the whistle throttle, there is no case for the jury, however rapid the train was running.

3. ———: Contradicting One's Own Witness: Engineer. A party who puts a witness on the stand and thereby vouches for his credibility, is not so far bound by his testimony to this or that fact that he may not show one or the other to be different by other witnesses—not to impeach his own witness, but to establish the truth. But unless there is substantial evidence from other witnesses that he, the sole eyewitness who saw all that occurred, was mistaken in fact, and plaintiff must show he was mistaken or have no case for the jury, then a demurrer to his case must be sustained.

4. ———: ———: Humanitarian Rule: Quickly Sounding Whistle. Where plaintiff's entire case is made to rest on an allegation that the engineer did not, as quickly as the law requires, sound

Rollison v. Railroad.

the whistle of his train at a public road crossing in the country, after he had seen deceased in peril, and the uncontradicted evidence is that deceased arose from behind the wing fence and started for the track six feet away, and was first seen when the train, running one mile a minute, was only 175 to 200 feet from the crossing, and the engineer, who was introduced by plaintiff, testified that he sounded the alarm whistle as quickly as he could after he saw deceased arise, there being only about two seconds of time in which to act, and there is no substantial evidence to the contrary (none by an eyewitness and only by earwitnesses to sound), a jury should not be allowed to say the engineer did not act precisely as he said he did.

5. ———: **Proximate Cause: Humanitarian Rule.** When a man without looking moves from a place of safety beside a railroad track, to a place of danger on the track and immediately before an oncoming locomotive, his negligence in so doing becomes the proximate cause of his consequent injury, and hence there is no room for the play of the humanitarian doctrine in any of its phases or for recovery.

Appeal from Macon Circuit Court.—*Hon. Nat. M. Shelton,* Judge.

AFFIRMED.

*Barker & Prosser* for appellant.

(1) The engineer testified that he saw deceased in a perilous position in plenty of time to warn him of his danger and that he did warn him; other witnesses testified that no warning was given; thus when defendant's engineer admitted that he saw and realized the danger of the deceased and these witnesses testified no warning was given, the case should have been submitted to the jury. The sole question in this case is as to whether or not the same should have been submitted to the jury. The engineer testified that he saw the deceased in plenty of time to give him a warning of his danger and that he did so. Other witnesses testified that no warning was given. The engineer's testimony is as follows: "Q. What was this

man Rollison doing when you first saw him? A. Walk-ing east. Q. That was toward the track? A. Toward the track. Q. What was his attitude? What did he seem to be doing? A. He did not seem to be paying any attention to anything only walking directly east. Q. When you first saw him he seemed unconscious of the approach of the train? A. Yes, sir." (2) First: Plaintiff's only chance for recovery is under the humanitarian rule as laid down by this court. The phase of the rule applicable to the facts of this case has been cautiously announced by this court, as fol-lows: "Plaintiff's case therefore must proceed upon the theory that defendant's servants saw the perilous position of the deceased, and saw such things as would lead prudent persons to believe that deceased was ob-livious to such perilous position, and after so seeing had time to obviate and avoid the accident by ordinary care and caution upon their part. It devolved upon the plaintiff to show these facts." Degonia v. Rail-road, 224 Mo. 595. And again: "Now grant it to be true that plaintiff was guilty of gross negligence, and by such had placed himself in a perilous position, this does not relieve the defendant, if by the exercise of ordinary care it could have seen his position of peril in time to have averted the injury." Clark v. Rail-road, 242 Mo. 603. Second: The only eyewitness to the accident was the defendant's engineer, who was of-fered as a witness for the plaintiff. He admits in his testimony, as will appear more fully hereafter: (a) That he saw the perilous position of the deceased; (b) that he saw the deceased was oblivious to such perilous position; and (c) that he had time to give, and did give, a short blast of the whistle as a warning signal, which, if heeded by the deceased, would have obviated and avoided the accident. Other testimony tended to show, however, that no warning signal was given by defendant's engineer until his engine was almost im-mediately upon the deceased. While the plaintiff was

compelled to offer defendant's engineer as a witness, yet she was not estopped by his evidence, nor bound by it, so as to preclude her from disproving it by the testimony of other witnesses touching the same matter. McGee v. Railroad, 214 Mo. 544. The important issue in this case is whether or not any warning signals were timely given, after defendant's engineer saw the perilous position of the deceased, and that he was oblivious to the approach of the train; and the vital question which now presses itself upon the consideration of this court is whether there was any evidence on the part of the plaintiff to justify the submission of this issue to the jury. Third: In the consideration of this question it is important to be noted that a demurrer admits every fact to be true which the evidence in the cause tends to prove, whether by direct testimony or by reasonable deductions to be drawn therefrom. Stauffer v. Railroad, 243 Mo. 316. (3) The engineer testifies that after seeing the deceased in a position of peril, and realizing that he was oblivious to the same, he yet had time to warn him, and did warn him with "a short blast of the whistle," at a point about 175 feet north of the crossing. But Dickerson, who was on the road immediately west of the track, and only nine hundred feet south of the crossing, did not hear this whistle. Lock, who was in the barn, only 150 feet west of the track and 300 feet north of the crossing, did not hear this whistle. Mrs. Elmer Rollison swears positively that the train did not whistle north of the crossing. And all of the last three witnesses testify positively that the "alarm signals" in evidence were not given until the engine was at or upon the crossing. Giving to plaintiff's evidence the favorable consideration which a demurrer thereto compels, can this court say, as a matter of law, that the engineer did give a warning signal in time to have averted the accident? Can it say, as a matter of law, that this "short blast of the whistle," if given, was a

sufficient warning under the circumstances?     Can it
say, as a matter of law, that the engineer exercised
due care in the situation with which he was confronted?
(4) "The court is not at liberty, in passing on such
demurrer, to make inferences of fact in favor of the
defendant, too countervail or overthrow either pre-
sumptions of law or inferences of fact in favor of the
plaintiff; that would clearly be usurping the province
of the jury."     Buesching v. Gaslight Co., 73 Mo. 231.
But let us indulge, for the moment, the hypothesis that
the engineer did give such alarm in the presence of
such an imperious call, and did it as quickly as he
could.   If we do, then we must also indulge the hy-
pothesis, equally reasonable, that the deceased would
have heard such alarm, and hearing, would have heeded
the same.   For all the witnesses agree that the de-
ceased, although hard of hearing, could have heard
the whistle of an engine.   And this means the acci-
dent would have been averted, because the engineer
himself testified:   "If he had heeded the signal, there
could have been no accident."   The instinct of self-
preservation becomes an element of evidence, for "nat-
ural instincts are allowed to have their weight and
constitute evidence to men of sense."   Dutcher v. Rail-
road, 241 Mo. 166; Stottler v. Railroad, 200 Mo. 146.
Maybe, hypothesis against hypothesis setteth the mat-
ter at large.   Again we call the court's attention to
the "unbending rule" that plaintiff "is entitled, on a
demurrer to the evidence, to every favorable inference
of fact naturally to be drawn from the evidence, and
that, if the facts be disputed, the jury, and not the
court, is the arbiter."   Knorpp v. Wagner, 195 Mo.
662.   This is a case where the engineer admittedly had
time to save life; where the peril of the deceased was
seen in time to have averted the accident, and where
there was nothing to prevent timely alarm signals from

being effective if they had been given.    It comes squarely within the doctrine of the humanitarian rule. Rapp v. Transit Co., 190 Mo. 161; Eppstein v. Railroad, . 197 Mo. 735; White v. Railroad, 202 Mo. 564; Zander v. Transit Co., 206 Mo. 464; Lynch v. Railroad, 208 Mo. 34; Ellis v. Railroad, 234 Mo. 671; Dutcher v. Railroad, 241 Mo. 159.

*J. L. Minnis* and *Guthrie & Franklin* for respondent.

It is such negligence as precludes a recovery for a person to go upon a railroad track directly in front of an approaching train and so close as to render it impossible to stop the train in time to avoid injury. Laun v. Railroad, 216 Mo. 563; Dyrcz v. Railroad, 238 Mo. 33; Schmidt v. Railroad, 191 Mo. 215; Farris v. Railroad, 167 Mo. App. 392; Boyd v. Railroad, 105 Mo. 371; Moore v. Railroad, 176 Mo. 528; Holwerson v. Railroad, 157 Mo. 148; Newton v. Railroad, 152 Mo. App. 167; Pennell v. Railroad, 153 Mo. App. 566; Stotler v. Railroad, 204 Mo. 619; Holland v. Railroad, 210 Mo. 338; Kilsea v. Railroad, 129 Mo. 362; Keele v. Railroad, 151 Mo. 364; McGee v. Railroad, 214 Mo. 530; Coldwell v. Railroad, 58 Mo. App. 453; Wand v. Railroad, 106 Mo. App. 96; Guyer v. Railroad, 174 Mo. 344.

LAMM, C. J.—Plaintiff, widow of William Rollison, sues in the Macon Circuit Court for statutory damages for her husband's alleged negligent death at a railroad crossing in the country.    When her testimony is in, defendant offers an instruction in the nature of a demurrer to the evidence.    The court signifies an intention to give it.    Thereat she takes a nonsuit "with leave" and, failing to get it set aside on motion, takes an exception and on apt and timely steps comes up.

Rollison v. Railroad.

The question here is: Was there a case for the jury? That question hinging on the pleadings and facts, attend to them.

Assuming conventional allegations, the actionable negligence is alleged to be that the servants of defendant in charge of one of its engines, pulling one of its south bound passenger trains, at a crossing known as Bumpus Crossing, after seeing decedent approaching the track there and on the track (quoting) "negligently failed to give the usual and ordinary signals of the approach of said train, and after seeing, or by the exercise of ordinary care could and would have seen the dangerous position in which deceased was situated, and seeing, or by the exercise of ordinary care could and would have seen the imminent peril of deceased, and that deceased was unaware of the near and dangerous approach of said train, negligently failed to sound the usual and ordinary danger signals in time to avert the injury complained of, and negligently failed and neglected to use the air brakes and other appliances provided for stopping said train, and negligently failed to use the appliances provided and at hand for putting said train under control and did not at any time before striking deceased ring the bell or sound the whistle, but on the contrary thereof recklessly and negligently ran its said engine and cars upon and against the plaintiff's said husband, and the plaintiff's said husband was then and there and thereby instantly killed; that said injury to plaintiff's said deceased husband resulted from, and was occasioned by, the negligence, unskillfulness and criminal intent of the officers, agents, servants and employees of defendant whilst conducting and managing said train at and prior to the time it was run against and upon the body of deceased."

The answer denied defendant's negligence, and, in turn, charged the contributory negligence of decedent in enumerated specifications.

*The Pleadings.*

Rollison v. Railroad.

The reply denied new matter.

Separating the facts on which there is accord from those on which there is not, the undisputed ones follow, viz.: Defendant's track at Bumpus Crossing runs north and south. An east-and-west public road crosses the railroad there at right angles. That east-and-west road also presently crosses (we infer) a north-and-south public road adjacent to, west of and running parallel with the railroad at the place. As there are two crossings in question and three roads, for convenience and to avoid confusion we will call the north-and-south public road A, the east-and-west one B, the railroad crossing X, the road crossing Y and the railroad itself Z. Decedent lived east of Z and south of B, south a half quarter and east a quarter. At Y he had his rural route mail box. He was sixty-one years old, with good eyesight, but very hard of hearing, an infirmity of long standing and getting sharply worse and worse with age, but he was not so deaf he could not hear engine "alarm signals." At X the roadbed of Z was elevated about two feet. At both X and Y, a man standing upright could, plainly and without break in sight, if he looked, see a train approaching from the north (or south) for, say, one mile. Decedent had long lived there and was familiar with the running time of the train that struck him. At X there is on the north a wing-fence of the usual height, but not so high as to hide a man standing upright. The town of La Plata is south of X about a mile and a half and both A and Z run to that town. Of a winter's day (January 21, 1909, at 9 a. m.) a neighbor of decedent, Dickerson, was driving a work team to a spring wagon going south on A to La Plata. When he got to Y he stopped and got out to read a sale bill posted there, and decedent came up on foot to get his mail from his box. The two neighbors, chance met, chatted awhile and then Dickerson went his way south on A. De-

**The Facts.**

cedent got his mail, some papers, and the next seen of him he was arising on the south side of said wing-fence, having been apparently stooped down there. At that time he was in B and about six feet from the rails at X and headed east that way. At that very time a regular southbound passenger train a little late and running fast, say, a mile a minute, was within 200 or 175 feet of X. Its engine was equipped with an automatic bell which was sounding at the time and had been for the statutory distance. The customary cross-ing whistles had been given at the whistling post north of X. The engineer first saw decedent as he arose from behind the fence, as stated, and at once was advised by his conduct that he aimed to go right on across the track at X. It is undisputed that alarm whistles were sounded, but, as it is contended by appellant's counsel they were not given as soon as they might have been, and *contra*, by respondent's, that they were, the facts on that controversy will come out presently in due course when we reach disputed ones. It is undisputed that if decedent had looked he could have seen a train, as said, for a mile while talking with Dickerson, and at any point between X and Y; that if the alarm whistle had blown when he was six feet from the track (and he had heard it) he still had time and space to save himself. But that, turning his head or glance neither to the right nor left and apparently uncon-scious of danger and preoccupied with his own thoughts, he pursued his way for a few steps and was instantly struck and killed as he reached the near-est rail at X, the train coming to a stop about a quar-ter of a mile to the south. So far as this record dis-closes no eye saw him alive after he parted from Dick-erson, save the engineer's and he was a witness for plaintiff. The engineer testified, and there is no con-tervailing testimony, that he was at his post of duty and on the alert outlook, that he caught his first glimpse of decedent as he arose from behind the wing-fence

about six feet from the track and 175 or 200 feet, on his estimate, from the on-coming engine.

So much for facts conceded as standing unimpeached.

We now come to some other testimony of plaintiff, which, it is argued by her learned attorneys, shows there was negligence in giving alarm whistles, or rather from which a legitimate inference springs to that effect. As said, plaintiff put the engineer on the stand and from him and other witnesses established the foregoing facts. The engineer testified that the instant his eye fell on decedent and he grasped the situation, viz., that decedent was bent on crossing, he gave alarm signals by blowing his whistle in three or four sharp short blasts to no avail. He whistled as quick as he could. But from three other witnesses, it is claimed, testimony was elicited tending to show negligence in the foregoing particular.

Here it is: Dickerson testified that after leaving decedent at Y he drove south on A in his spring wagon on a muddy road in a trot for 900 feet, at which point he heard shrill alarm whistles behind him and then turned his head, looked north and saw decedent's body in the air. That he turned as quick as he could, "just like any one when he heard a quick sound that way." Decedent's body was in the air ahead of the engine on the south side of X. (*Note*: The mail box was on the north side of B which would bring any one traveling east along there close to the wing-fence, as decedent did, on the north side of X.) The alarm whistles causing witness to turn his head and look back were in quick succession.

Another witness, Lock, was in a barn currying a team of horses. As it was winter, absent testimony on the point (as here) we will assume the doors were shut. This barn was about 300 feet north and 150 feet west of X. He heard, but did not see, the train pass the barn going south. He heard alarm whistles right

after the train passed, and, judging alone from the sounds, he located them at X. "I would say," said witness, "it was right at the crossing . . . the north cattle guard." The cattle guard is about ten feet north of the wagon crossing. Witness then came out of the barn and when he first saw the train it had stopped after running down south of X about a quarter of a mile. Witness had paid no attention to the train till he heard the alarm signals. In going to the barn door to look out, as he had to, he traveled about thirty feet and when he got to where he had a view of it, the train was at a standstill.

Mrs. Rollison, a daughter-in-law of decedent and living with him in his house, situate, as said, east a quarter and south a half-quarter from X, testified with uncommon candor and naivety, to this effect: It being a cool morning the house was shut up. She had been assembling her husband's shaving material for his use and was looking out of a north window for several minutes (fifteen or twenty) when her eye lit on the train (evidently cross-lots to the northwest). It was then, in her judgment, seventy-five or eighty feet from X. She heard no signals until, she thinks, it got to X when she heard three or four alarm whistles. There was not any whistle before that. She did not, however, see the train go on the crossing. It may be well to give some of her testimony in chief at this point, as it fell from her lips, thus:

"Q. About what distance did you see the train cover—about how far from the crossing when you first saw the train? A. Well, I should judge seventy-five or eighty feet from the crossing when I first noticed it.

"Q. And then how far did you see it or was it just a glance? A. No; I was looking right at the train. I first glanced there, then I could see it until it got almost on the crossing, just approaching the crossing.

"Q. You may tell the jury if at the time you saw it, if any signals were given by the train? A. What do you mean?

"Q. When you saw it? . . . A. No, sir; there was not any whistle; I saw the train. . . .

"Q. How far is the Rollison house at which you were staying from this railroad crossing? A. A quarter of a mile east and a half a quarter south, I think.

"Q. You may tell the jury if you had a clear view of the track? A. Yes, sir.

"Q. Tell the jury why you did not see the train go on the crossing? A. *Well, I would have had to have turned to have seen the train go on the crossing. I did not turn, I looked straight ahead, did not turn enough to see it.*"

There was no obstruction to sight between the house and X. Witness from her north window could have seen the train clear to the whistling post, in fact for a mile, had she been looking for it, but it fell under her eye about seventy-five or eighty feet, she thought, from X. It was, she admits, a mere estimate. She did not see decedent struck.

Such is the case.

On that record we have no hesitation in holding that a demurrer to the evidence laid, hence there was no error in forcing a nonsuit or in refusing to set it aside. This because:

(a) In applying the law of negligence to accidents at public road crossings, it is settled doctrine that, barring cities, so far as statutory crossing signals are concerned (R. S. 1909, sec. 3140) the duty of a railroad company is performed when it provides a bell on its locomotive, rings it eighty rods from the crossing and then keeps it ringing until the locomotive has crossed the public road; or a steam whistle on such locomotive must be sounded at least eighty rods from the crossing and thereafter sounded at intervals until

*Bell or Whistle at Crossing.*

the locomotive has crossed the road. . Observe, by the very words of the statute, the company can do one or the other. It need not do both. So we have always held. [Terry v. Railroad, 89 Mo. 586.] If, then, appellant had counted in her petition on the negligent pretermission of statutory signals, which she did not do we think, she would have no case on that view, because her testimony shows there was no lapse in statutory duty, at least in bell ringing. By the same token, *a fortiori*, had she no such case when, it seems, she did not sue on that theory.

(b) Take another phase in the application of the law of negligence to crossing accidents, to-wit, that of the train's stopping or slacking its speed in order to save an exposed person from death or injury. It is no longer necessary to cite authority for the proposition that when a person is exposed to imminent peril on a street or at a public crossing, then those who control the threatening on-coming instrumentality, and who see him or who by due care might see him in danger, must use due care to avert his injury by stopping if stopping is possible with the means at hand and safely usable. The master voice of humanity cries out for so much as that and the law, an invention for the welfare of man, knows its master's voice and heeds it. It, however, is evident plaintiff's case cannot prosper on that theory. Trains may be run in the country, away from congested populations, at any practicable rate of speed, absent statutory regulation, as in this State. [McGee v. Railroad, 214 Mo. l. c. 541; Burge v. Railroad, 244 Mo. l. c. 103, and cases cited.] It follows that speed rate, under such circumstances, may not become negligence *per se* or at all and only assumes material value on the question of stopping or slacking wholly or partially. Now, in this case, at a speed of a mile a minute, this train ran eighty-eight feet per second, and in two seconds would cover the 175 feet the engine was

*Humanitarian Rule.*

distant from X when decedent was six feet away from the danger zone. Assuming decedent intended to cross, no mortal power could have stopped or slackened the speed of that train in time or to a distance adequate to save his life. Indeed, appellant if she did allege it in her petition did not attempt to prove negligence in that behalf, as we gather. Accordingly the case could not have been submitted to the jury on that theory.

(c) But stopping, or rather inability to stop, did not measure the full duty of respondent to decedent. It owed him the duty to warn him, to tell him it proposed instantly to occupy with its ponderous death-dealing machine the identical spot its servant, the engineer, saw he was heading to (a fact known to the engineer and not known to decedent). That machine was equipped with bell and whistle for that identical purpose. Defendant concededly used the bell. Did it also in the imminence of the crisis use the whistle diligently? It may be laid down as the rule in this jurisdiction, that, shifting and measured by circumstance, the duty to alarm with the whistle, when the monotonous stroke of the bell is plainly ineffective, as here, to arrest the attention of a person who has (negligently or not) put himself in peril, of which he is apparently unconscious and of which the driver of the locomotive is conscious, is an essential part and parcel of due care and of the humanity rule. [Eppstein v. Railroad, 197 Mo. l. c. 735; Reyburn v. Railroad, 187 Mo. l. c. 573-4; Dutcher v. Railroad, 241 Mo. 137.]

*Duty to Use Whistle.*

But that rule does not aid appellant an iota. Her case being fatally clogged and handicapped, as it is, by the unmistakable and singular negligence of her unfortunate husband in going upon a live railroad track with a train due and without the slightest precaution against danger, where, being deaf (a thing he knew and which the engineer did not know) he was under the spur of the sharper instinctive duty to use his

eyes, his widow could only recover by carrying the burden of showing defendant's negligence in one particular, viz., in not giving timely warning by whistle; for defendant, on this record, came up to high watermark in duty in all other respects and we think it did in that also.

Let us look to that. It is admitted by appellant that if the engineer's testimony is to be believed there is no case at all for the jury; for he says he gave the whistle alarm as soon as his eye saw and his mind could conceive the situation and his hand grasp the whistle throttle.

Counsel, in this predicament, invoke the rule, to-wit, that the party who puts a witness on the stand and by that act vouches for his credibility is not so far forth bound by his testimony to this or that fact that he may not show one or the other to be different by other witnesses—not to impeach his own witness, but to establish the truth. There is a working rule of that kind. [Phelan v. Paving Co., 227 Mo. l. c. 711, and cases cited.] But that rule does not solve the riddle put up to us in the instant case. There is left, to do that, the answer to the one narrow and blunt question: Was there any substantial evidence from other witnesses that the sole eyewitness on the ground, who saw all and whose act is to be judged, was mistaken in fact when he said he acted as quickly as he could after he saw decedent arise and start to his death?

*Vouching for Witness.*

It would be, I think, to shock the conscience common to all mankind to indulge the hypothesis, absent proof, that the engineer would not give such alarm in the presence of such an imperious call and do it as quickly as he could. He had only two seconds in which to act and we think, on the record brought here and confining our ruling to the very case in judgment, that a jury should not be allowed to say he did not act precisely as he said he did. Because:

Rollison v. Railroad.

Assuming, as we are glad to do, that the natural instincts of the engineer would be to do exactly what he says he did (whereby does not nature itself fortify his testimony?), we have, as against that, the mere conclusion of *ear*witnesses that he did not—earwitnesses to *sound* and who did not in the least qualify in that regard—a fatal infirmity withal. [Campbell v. Railroad, 175 Mo. 1. c. 177 et seq.] Not one of them saw the engine at the immediate time it whistled. Dickerson first heard the whistles and *then* turned his head to look back. As we have weasels and tortoises in *ferae naturae,* so one man is nervous and quick in movement; another, slow and phlegmatic. How was Dickerson at the spot where that shoe pinches? When we are dealing with *seconds* and few at that, as here, an answer to that inquiry might be vital; for all philosophers admit that "men are not obligingly built along simple and uniform lines" in that respect. Moreover, how much of those two seconds the engineer had to act in passed while Dickerson was (1) hearing, next (2) apprehending and then (3) turning? When he did finally *see,* he saw decedent in the air, and he thinks across the roadway at X. How long had he been in the air? From what he heard in whistling (we presume thereby locating in his mind the spot the sound originated) and from the time he used in turning his head, he infers the whistles were given about at the cattle guard and not 175 feet north, as the engineer said. It is on such unsubstantial and elusive premise his conclusion is drawn. That inference is worthless, or, to put it milder (hence, better) it is impossible in the nature of things to say it has any probative force. It would depend on unknown factors, to-wit, on the accuracy of Dickerson's guess at the speed of a train he had not up to that time seen, on the time it took him to hear and think and turn, on

*Earwitnesses.*

his memory of his ear-location of the place of the origin of the sound as compared with the location of the locomotive when his eye came to his aid, on his expertness in locating sounds and judging distance therefrom. If Dickerson turned, as he says he did, after hearing three or four short blasts, it is material to know what increment of time passed during those blasts and how far the engine ran during those blasts? If it be said we are dealing in refinements, the answer is: So must appellant's learned counsel deal in refinements to fasten liability on defendant, and, may be, refinement against refinement (like estoppel against estoppel) "setteth the matter at large." To predicate negligence on two seconds of time is in and of itself a monumental refinement. We cannot adjudicate negligence on such pulse beats and hairsplitting, such airy nothings of surmise. It will be time enough for courts to undertake to do that when they are able to do what one Samuel Butler, nigh unto three hundred years ago, said his hero (?) did, viz.:

> "He could distinguish and divide
> A hair 'twixt south and southwest side.
>
> . . . . . . . . .
>
> For he by geometric scale
> Could take the size of pots of ale.
>
> . . . . . . . . .
>
> And wisely tell what hour o' the day
> The clock does strike by algebra."

What is said of Dickerson's testimony is true in a greater degree of Lock's; for he saw nothing at all. He merely heard the noise of a train going by the barn and afterward heard the alarm whistles. He then undertook to calculate and form a concept of *where* it was when it whistled—this, apparently, by running back in his mind and remembering the time that had elapsed since he heard the train go by. By

that precarious process, in a nice calculation, involving an instant of time, short space and great speed, he, too, concluded it was right at the crossing and not 175 feet away when it whistled. Now, it is too plain for cavil that the soundness of that conclusion on sound depended on the speed of the train, an unknown factor to him at that time, or at any time.

The witness, Mrs. Rollison, thinks she saw the train when it was seventy-five or eighty feet from X. She was looking fixedly through a window in one line and casually saw a train coming into (and then going out of) her line of vision, at an angle towards that line and *stiffly over a quarter of a mile* away. That she considered the incident listlessly is clear enough; for she did not turn her head far enough to follow the train, or see X at all. True she finally heard the whistles and was permitted to tell, from that sound as a sole factor, that it was at X instead of 175 feet from X. The value of her estimate depended also on factors unknown to her, viz., the real distance of X from where she casually saw the train, and, next the speed of the train, a thing she knew nothing about. To hazard a guess on how far it went after she saw it until she heard the alarm whistles, without knowing its speed, would be idle. Not to allow for the appreciable time it took for the sound to carry from the engine to her ear, would be unscientific; for, as said, we are dealing with seconds in order to transfer $10,000 from the pocket of A to the pocket of B— a delicate function.

The trial court did not see in all the foregoing such contradiction of the positive evidence of plaintiff's witness, the engineer, as called into play the decision of the triers of fact. Neither do we. There was, then, no substantial evidence of respondent's negligence, and, failing in that, no case.

Furthermore, the case on the facts is also brought within the rule of the law of negligence, to-wit, that

Proximate Cause. "when a man without looking moves from a place of safety beside a railroad track to a place of danger on the track, and immediately before a coming locomotive, then, in the eye of the law, his negligence in so doing becomes the proximate cause of his consequent hurts, hence there is no room for the play of the humanity doctrine in any of its phases or for recovery. [Dyrcz v. Railroad, 238 Mo. 1. c. 47; Schmidt v. Railroad, 191 Mo. 215; Stotler v. Railroad, 204 Mo. 619; Burge v. Railroad, 244 Mo. 76; Watson v. Railroad, 133 Mo. 1. c. 250 et seq.]

If, as has been wisely said by a great authority on the philosophy of the law, "Law is beneficence acting by rule," then courts must conform to established rules in order that law be beneficent. We best adhere to established rules in negligence cases in holding as announced.

Look at it as we may, if that sympathy for the widow, which we confess, is not to quite run away with reason, the judgment was right. Let it be affirmed. It is so ordered.

*Woodson, Graves, Brown, Walker* and *Faris, JJ.,* concur. *Bond, J.,* dissents.