MARY W. MAGINNIS, Appellant, v. MISSOURI PACIFIC RAILWAY COMPANY, Respondent.

St. Louis Court of Appeals. Argued and Submitted March 1, 1915. Opinion Filed April 6, 1915. Motion for Rehearing Overruled May 18, 1915.

1. APPELLATE PRACTICE: Power of Court to Correct Own Errors. The power of an appellate court to correct its own errors is self-evidently an integral part and parcel of its power to correct the errors of other courts, and the duty to correct them in the same case, at the first opportunity, is always present, where a ruling is sharply wrong and unsettles correct practice or the law.

2. RAILROADS: Duty of Engineers: Emergency Acts. An engineer on a railroad train is required to exert constant watchfulness and extraordinary care, but while, in the course of his duty, he is often required to act on the instant, the law does not hold him guilty if in that instant he errs, provided he does the very best he can under the surroundings as he sees them.

3. EVIDENCE: Conjecture. A verdict cannot rest upon mere conjecture.

4. RAILROADS: Injury to Person at Crossing: Last Chance Doctrine: Sufficiency of Evidence. In an action for the death of a person by being struck at a crossing by a railroad train, evidence *held* to show that decedent moved from a place of safety into a place of danger so quickly that the engineer did not have an opportunity to avoid the accident, and hence it is *held* that plaintiff was not entitled to recover under the last chance doctrine.

*Held*, by NORTONI, J., dissenting, that the evidence was sufficient to warrant submission of the case to the jury under the last chance doctrine, on the theory that the engineer, after discovering the peril of decedent, could have prevented the collision by sounding the alarm.

Appeal from St. Louis City Circuit Court.—*Hon. George C. Hitchcock*, Judge.

AFFIRMED AND REMANDED. CAUSE CERTIFIED TO SUPREME COURT.

*Glendy B. Arnold* for appellant.

(1) The demurrer to the evidence was properly overruled. The case was one for the jury. Maginnis v. Railroad, 165 S. W. 849. (2) The facts and the law of this case are *res adjudicata.*

*James F. Green* for respondent.

(1) A clear case of contributory negligence on part of Maginnis was disclosed by the evidence. There was no showing of facts justifying the application of the humanitarian doctrine. Keele v. Railroad, 258 Mo. 62; Burge v. Railroad, 244 Mo. 76; Dyrcz v. Railroad, 238 Mo. 33; Bennett v. Railroad, 242 Mo. 125; McGee v. Railroad, 214 Mo. 543; Laun v. Railroad, 216 Mo. 563; Stottler v. Railroad, 214 Mo. 619; Holland v. Railroad, 210 Mo. 351; King v. Railroad, 211 Mo. 13; Sanguinette v. Railroad, 196 Mo. 466; Green v. Railroad, 192 Mo. 131; Markowik v. Railroad, 196 Mo. 550; Ries v. Transit Co., 179 Mo. 1; Farris v. Railroad, 167 Mo. App. 392; Newton v. Railroad, 152 Mo. App. 167; Burnett v. Railroad, 172 Mo. App. 51; Gumm v. Railroad, 141 Mo. App. 313; Dey v. Railroad, 140 Mo. App. 461; Kelsay v. Railroad, 129 Mo. 365; White v. Railroad, 159 Mo. App. 508; Vonbach v. Railroad, 171 Mo. 338; Guyer v. Railroad, 174 Mo. 344.

REYNOLDS, P. J.—This is the second appearance of this case before us on appeal from the action of the trial court in sustaining a motion for new trial and setting aside the verdict which had been rendered by the jury, in each case a verdict for $2000 in favor of plaintiff. On the former appeal we held that the action of the trial court in granting a new trial should be affirmed, but we remanded the cause for further proceedings on the ground that if a recovery is to be had at all "it must be sustained only on the last chance

doctrine, for the fault of the engineer in omitting to exercise ordinary care toward averting the injury after he either saw or might have seen the decedent about to become in peril—that is, coming toward the track in such a manner as to suggest the danger of a collision and to call for precautionary measures on his part.'' [Maginnis v. Missouri Pacific Ry. Co., 182 Mo. App. 694, l. c. 718, 165 S. W. 849.] The issues in this last are as in the former trial and the evidence in this last trial while it followed very closely that in the former, did so with some marked differences which we will notice.

The two witnesses as to the main facts connected with the movements of the decedent at the time of the accident, who testified at the former trial, again testified at this second trial, namely, Mr. Evers, the proprietor of the store referred to in the opinion, which was located on the west side of the Berry road and to the south of the railroad crossing, and the engineer of the train, Mr. Hayes, the latter the only eyewitness to the accident, who at this last trial was called and put upon the stand by plaintiff.

There was some evidence for the defendant, introduced at this second trial, after it had interposed a demurrer to the evidence, which does not appear to have been introduced at the former trial. It was given by a gentleman who was a passenger on the train. This witness on this second trial testified that on the morning of the accident he was sitting in the smoking car when he heard the whistle blowing, first, apparently, the ordinary crossing whistle, then in a little while short and quick and many blasts. He put his head out of the window, thinking that the train was about to run over something and saw a man going, as it appeared to him, at a right angle, to cross the track ahead of the train. It seemed to him that the man was quite a little bit in front of the engine but the witness could not tell whether he was in danger or not and it looked to him like he was trying to cross at right angles and

was either running or walking very fast. There were something like four cars between the witness and the engine, and the witness was looking alongside the train as it ran, and the man disappeared from his view, whereupon the witness ran across to the other side of the car to see if the man had got away. When he got there he saw nothing of the man. The train stopped, backed to the station and he got off and helped put the man whom he found lying there, on a stretcher.

On cross-examination this witness testified that the quick, short whistle he heard was what he considered, not being a railroad man or an expert, an alarm whistle, of such a character as to indicate to him that there was something on the track. That was what attracted his attention and caused him to look out; could not tell where the train was when he first heard the whistle; had heard the whistle before he looked out; may have heard it eighty rods before he got to the crossing, but as he was a stranger, not acquainted with the locality, did not know that the alarm whistle, as he called it, was what caused him to look out, the whistle preceding that not having attracted his attention, as we understand his testimony. This testimony supports the conclusion reached by our court that there was nothing lacking in the way of signals or of actionable negligence on the part of the engineer, in so far as that feature of the case is concerned, and in a way supports the testimony of the engineer.

Referring to the testimony of the witness Evers, proprietor of the store, as set out very fully in the former opinion, it is to be noted that he testified that he had traced the course of the decedent by footprints, identifying these footprints as those of the decedent by cracks in the soles of his shoes. That is, he found cracks in the footprints corresponding to those in the shoes. So he testified at this last trial, testifying that after the train had left, he, with several others, went out and followed these footprints. It had been rain-

ing the night before or early that morning and the crossing was muddy. The mud from the road had got upon the crossing. There were four planks to each track, that is two planks on each side of the track, at this crossing. Evers and the others followed these footprints *"on those planks to the last plank on the— this is, the last inside plank on this crossing."* These planks were about sixteen feet long—two to the south, two to the north of the rails, said this witness. In this he is in error, for there were also two between the rails. This last plank was near the north rail. They saw three or more of these tracks, that is, six footprints in all, three pairs of them, as we understand, showing the imprint of the broken sole of the shoe. The beginning of these tracks, he testified, was *"right at the driveway or where the teams had carried the mud along the cinders."* Asked at what end of the crossing, he answered, "The west end of the planking. Q. The beginning of the tracks was at the west end of the planking? A. Yes, sir." Asked to describe this more fully, he did it with photographs before him, by pointing to them on the photographs. But it is impossible for us to locate the tracks by this, as the point is not marked on any of the photographs produced before us. This witness stated, pointing to the photograph: "We first noticed his tracks in here some place, and then they came up along over the rail. . . . My recollection is that the first steps that we could follow were just about at this point *on the crossing.* Q. Which point is that? A. That is the west point, about even with the west point of the planking, and he (decedent) apparently followed the rail over to the north side on the east side of the roadway. Q. It wasn't between the rail? A. No, sir—that is my recollection. The last step was on this plank next to this rail," witness indicating the north rail near the end of the plank, and as he repeated near the end of the plank. This footprint was on the last plank. It is clear that when this

witness speaks of the "plank walk," except when he refers to one north of the tracks, that he is referring to the boards at the crossing of the dirt road over the tracks.

On cross-examination, this witness testified that he saw about three prints of each foot. Asked if at the time when he looked out there in the mud for these tracks, he had looked anywhere else for tracks except alongside the rail and between the rails, the witness answered: "A. We couldn't follow him on the plank walk or in the cinders distinct," repeating that they could not follow him on all of the plank walk, only where the cinders had mud on them. This examination was made after the train had proceeded to St. Louis and after several people had crossed back and forth over the boards and crossing. No comparison of the footprints with the shoes of decedent was made other than that Evers testified that he saw that the soles of the shoes had a crack in them and that he found a crack in these tracks or imprints.

As the testimony of the engineer is not given in full in the opinion formerly rendered, we think it well to set it out at some length. Called and testifying on behalf of plaintiff at this last trial, the engineer, Hayes, stated that he was the engineer in charge of the engine which struck and killed Mr. Maginnis on the date named. He had taken charge of the train as engineer at Jefferson City and was running it into St. Louis. At the time of the accident the train was going at about forty or fifty miles an hour, as he guessed. (The train running from west to east, the Evers store south of the railroad tracks and on the west side of the Berry road, one directly in front of the store would not be within the view of the engineer as he drove east until he had cleared the store.) When he first saw Mr. Maginnis as his train approached Berry road crossing that morning, Mr. Maginnis was just emerging from behind Mr. Evers' store; had just come out from behind that store.

Asked how close to the end of the store he thought Mr. Maginnis was, Hayes answered that it was hard to tell; that he should judge though, three or four feet; from three to four feet possibly from Mr. Evers' place; that is from the northeast end of Evers' store. Witness had blown his whistle at the eighty-rod post, which is the post eighty rods west of the crossing, blowing the crossing signal, two long and two short blasts of the whistle. That is the crossing signal and differs from the alarm signal in that the alarm signal is a short blast of the whistle, as fast as you can blow it. The train was composed of six cars and after strik-ing Mr. Maginnis it ran some six or seven hundred feet. Asked when he had applied his air brake before striking Mr. Maginnis, witness answered that he should judge that it was any where from forty to fifty feet west of the crossing, possibly more. Asked if when he saw Maginnis was going on the track he had thrown off steam, the witness answered that his steam was thrown off long before that; that there is a down grade there and they were ''drifting.'' When he blew this second or alarm whistle witness testified that to the best of his recollection, he was possibly sixty feet or seventy-five feet away from the crossing. This occurred, said the witness, three years ago and it was hard to answer a question of that kind as to distances accurately. Con-tinuing his testimony the witness stated that he started to blow the crossing whistle after he had first observed Maginnis, with a double warning and as soon as he saw him divert his course and go across the track he changed it into an alarm whistle and applied the brakes. Asked how far he thought his engine was from the crossing boards of the Berry road when he sounded the crossing signal, which preceded the alarm, he re-peated that he should judge he was from sixty to sev-enty-five feet. On the remark of the court that he did not understand this answer, counsel for plaintiff stated he would bring that fact out again. He then said to

the witness that as he (counsel) understood the witness, he whistled for the crossing as his engine was about to pass the whistling post eighty rods west of the crossing board; that the next crossing signal he gave after that was the one which preceded the alarm whistle. To which the witness said, "Yes," that he started to give a crossing signal; that this was when his engine was sixty or seventy feet from the crossing; that was when Maginnis had first emerged from behind the store, "apparently going across the track, that is the road crossing the track." Asked if as soon as he saw Maginnis running he had given him a signal, the witness answered, "After I thought there might be a possibility of danger, I gave him a double warning. I thought then he diverted his course straight across." Asked what course he did pursue until he was struck, witness answered that Mr. Maginnis "left the sidewalk near Mr. Evers' store and started diagonally across the roadway, that is, the wagon roadway, for the depot, diagonally across." He appeared to be running toward the station there. (This station is south of the tracks and some distance east of the Berry road and diagonally east, northeast of the northeast corner of the Evers' store, judging from the plat before us about eighty-five feet east, northeast, of that store, the station standing back about twenty feet from the south track.) The witness testified that after taking possibly one or two steps past Evers' store, Maginnis left the sidewalk, starting diagonally across toward the station. Shown the photograph which was in evidence and saying that he could not explain it by that, witness said that he could explain it so that anybody who had been on the premises could understand it. "As near as I can tell (said the witness) he (Maginnis) entered what would be this cinder path here in front, about even with this crossing plank on the north side. It might have been a little bit east." Witness then illustrated his testimony by pointing to a plat which was

before the jury but as the points he pointed to are not on the plat before us, it is impossible to locate this. With the plat before him the witness testified that as near as he could tell, Maginnis stepped over about directly even with the board walk, evidently meaning the board walk to the north of the railroad to which he had just pointedly referred, and not the board walk in front of Evers' store; that the cinder walk comes along up to the crossing and he went from a place indicated by witness on the plat from the corner of the store diagonally toward the station, as near as he could tell even with that walk, "and then diverted his course directly north across the tracks." Asked how many miles an hour he would reduce the speed of his train to while it was running 300 feet after the application of the air, witness answered, "I don't think any human being would answer that." He had not only applied the air brakes on this occasion but had used sand, the effect of which latter is generally to help check speed, although occasionally the engine will slide on sand but not often. Asked if Maginnis had shown any indication to him that he knew the train was coming, he answered, "The indication was to me that he was trying to make the depot for to catch a train, a weekly suburban train that stopped there on week days, and we were on their time. That is the first impulse I had when I saw him running toward the depot. That is the only indication I had that he believed it was a suburban train, that was my impression." Witness did not see him turn his head at any time and look at the train. "In fact, I didn't look close for that, because I was sure he was going to catch this train." Asked if he had done anything that indicated to witness that he knew the train was that close to him, the witness answered that not as far as he could see; had not seen him at the very moment he was struck. The engine had obstructed his view after Maginnis had passed on the track, he being struck on the left side of the track and

the engineer being on the right side of his engine.
Asked by counsel for plaintiff if there are some con-
ditions under which his train, with safety to passen-
gers and under the conditions which existed at that
crossing at that time, the track in good condition,
brakes in good working order, with the speed of the
train at forty-five miles an hour, it might be reduced
as low as twenty miles in 300 feet, the witness answered
that that "would be mighty short;" that he supposed
it could be done under certain conditions.  He was
then asked by counsel for plaintiff this question: "You
did everything in your power to avert this man's
death?"  To which he answered, "After I saw him
in danger, yes, sir, nothing more could be done."  On
cross-examination by counsel for defendant, witness
testified that there was a suburban train that usually
stopped at Glendale about the same hour in the morn-
ing that this train reached there; that, however, is
on week days, but as this was on Sunday that suburban
train was not running.

Cross-examining him on part of defendant, coun-
sel asked witness this: "Now, when you saw Mr. Ma-
ginnis coming out from the end of the board walk,
you say he started as though he were going to the sta-
tion?"  Witness answered, "When he left the board
walk; he wasn't to the end of the board walk."  Coun-
sel repeated, "He came to the end of the board walk
and he was coming north until he came to the end of the
board walk?"  To which witness answered, "He never
came to the end of the board walk."  (Here it is to
be noted that it is stated in our former opinion (l. c.
710), that it appears that Maginnis followed the side-
walk to the end of it, twenty-one feet south of the
south rail and then turned to the northeast.  This, it
will be seen is flatly contradicted by the engineer at
this trial, a very important difference.)  When he was
coming down toward the track he was coming north;
when he went off of the board walk and started to-

ward the station he was going diagonally across the Berry road and through the cinders toward the station. Asked if after Maginnis left the board walk going toward the station he was parallel with the east track, witness said that he would hardly put it that way, that if counsel meant by parallel that Maginnis was going right directly along the side of the track, he was not. Asked if while Maginnis was headed toward the station he had his back to the witness, witness answered, "Well, it couldn't quite be his back. It would be more his back than side," but as far as witness could see, the decedent had never looked toward the train but was headed toward the station. Asked if the deceased was in a position of safety so long as he continued toward the station and until he diverted out, witness answered "yes, sir." Asked if he was in a position of perfect safety, so far as that train was concerned until he suddenly diverted his course and started across the track, asked if that was what he meant, witness said, "Yes." These questions and answers then followed and closed the cross-examination of this witness, the engineer, and refer of course to the decedent: "Q. After he diverted his course and started across the track, was there anything on earth that could have been done to save him? A. Nothing; only for him to stop. Q. He could then have stopped and avoided the accident? A. Yes, sir, he could still have stopped. Q. He could still have stopped and avoided the accident? A. Yes, sir. Q. Could you have done anything to avoid it? A. No, sir; nothing more than I done."

On redirect examination by counsel for plaintiff the witness was asked what opportunity he had to give a crossing signal after Mr. Maginnis made this sudden turn toward the track and before he got on the track, witness answered, "I never made a crossing signal when he made—I started to make a crossing signal only once before he diverted his course directly

across the track. While he was crossing the road crossing and he was getting near this cinder path, then I started as a double precaution to whistle the road crossing, when he darted across, and then I changed it to alarm and applied the emergency brake.'' Witness testified that he had given the regular signal for cross-ings at the whistling post about eighty rods away; that signal was two long and two short whistles. His fire-man was in the cab with him and ringing the bell; had continued ringing the bell until after the accident oc-curred and until after they had passed over the cross-ing.

It is contended that the testimony of Mr. Evers, the storekeeper, and of Mr. Hayes, the engineer, is contradictory and irreconcilable and that this made the case turn on the question of fact and hence subject to the action of the jury. We are unable to concur in this view of the testimony. In the first place Mr. Evers does not testify that the decedent continued along the plank walk in front of his store to the end of that walk. Mr. Evers does not pretend to say at what point any footprints showed that the decedent left that walk nor the direction which he had taken after he left that sidewalk. The testimony of the engineer is positive that he did not go to the end of that walk but that after taking two or three steps from behind Evers' store the decedent had started in a diagonal direction toward the station which is on the same side of the railroad tracks as is Evers' store, east of that store and south of the tracks. Evers testifies that he found these tracks commencing *toward* the west end of the sixteen-foot planks at the crossing. He found three of them going toward the northeast corner of the crossing and it was at the northeast corner of these planks or crossing that Maginnis was hit and killed. When he was taking these two or three steps on these planks inside of the rails, it was after he had changed his course and as

190MA35

the engineer said, attempted to go directly across the
tracks. What course he took on the tracks is not in
evidence, so far as concerns the testimony of the en-
gineer. He did not attempt to say, as he could not see
Maginnis on the tracks for he would then be directly
in front of the engine and out of the immediate line of
vision of the engineer. If Mr. Maginnis left the plank
walk, which is in front of the Evers store, at the end
of that walk, as is stated in our former opinion that
he did, then his course toward the depot would hardly
be called diagonal, for the end of that walk is almost
directly opposite the center of the depot, which by the
plat appears to be about twenty-five feet wide. But if
he left that sidewalk, as the engineer positively testi-
fies that he did, only two or three feet north of the
Evers store, and took a few steps toward the depot,
he would be pursuing a diagonal course toward the
depot. He then diverted his course, as the engineer
testifies, directly across the tracks and after he was
about even with the west end of the crossing planks,
and so the engineer says he did. That would have
brought him to the point on the crossing boards where
Evers says he saw the first footprint. In this view
of the evidence, that of Evers and Hayes is not con-
flicting; certainly not so conflicting when we consider
that the engineer is testifying to the facts as he saw
them, as to warrant the jury in disregarding this posi-
tive testimony of the engineer and place its verdict on
the evidence of Evers as to the footprints.

As here applicable we may well quote what our
Supreme Court has said in Rollison v. Wabash R. R.
Co., 252 Mo. 525, l. c. 539, 160 S. W. 994: "Was there
any substantial evidence from other witnesses that the
sole eyewitness on the ground, who saw all and whose
act is to be judged, was mistaken in fact when he said
he acted as quickly as he could after he saw decedent
arise and start to his death?" We think there was
not.

The learned counsel for appellant claims that we are concluded by our former opinion in this case on the question of there being evidence to take the case to the jury on the last clear chance or humanitarian doctrine; that what is there said on that is the law of this case. The learned trial judge had that opinion before him and did not think it conclusive on this point. Nor do we. Even if that opinion goes as far as counsel contended, our Supreme Court has laid down a rule in Bowles, Guardian, etc. v. Troll, Pub. Admr., 262 Mo. 377, 171 S. W. 326, which must govern us as here applicable. There it is said, referring to the right of an appellate court—as we are—to correct its own errors, if any are made—in the same case, "The power to correct our own is self-evidently an integral part and parcel of the power to correct the errors of other courts, and the duty to correct them in the same case at the first opportunity is always present where a ruling is sharply wrong and unsettles correct practice, or the law." [See, also, Keele v. Atchison, Topeka & Santa Fe Ry. Co., 258 Mo. 62, 167 S. W. 433.] Without holding that our former opinion in this case is error, on this point of there being sufficient evidence then present to take the case to the jury on the last clear chance or humantarian doctrine, we here hold, that in the case as now before us, and on the evidence now present, evidence drawn out and presented by the appellant, plaintiff below, herself, there is no substantial evidence in it to take the case to the jury on the last clear chance or humanitarian rules.

On all the other propositions involved, the evidence here is practically as before and our conclusion on it is as before; that is, that plaintiff made out no case.

In short, we do not consider that the positive, affirmative testimony of the engineer, the only eye-witness to the accident, can be said to be contradicted by or inconsistent with that of Mr. Evers as to foot-

prints which are, inferentially only, those of the decedent.

This whole accident was one of seconds: a very few seconds, at most.

In Underwood v. St. Louis, I. Mt. & S. Ry. Co., 182 Mo. App. 252, 168 S. W. 803, commenting on the difference in the testimony as to the position of the horse and buggy, between that of the engineer and witnesses for plaintiff, the Springfield Court of Appeals has said (l. c. 273): "But why speculate as to one or two seconds in time and five to ten feet in the distance of the horse from the track? Liability cannot be predicated on so narrow a margin. The burden is on the plaintiff to prove the facts which bring the case within the rule now invoked. Engineers are human beings and we cannot exact of them to act instantly and in the most intelligent way in cases of emergency. Liability does not arise from mere errors of judgment or failure to act instantly in such cases. Every one knows that the very necessity for instant action delays the same and emergencies demanding quick and intelligent action breed confusion and delay. An act which ordinarily would be performed in a second, if limited to that in order to save life often paralyzes the efforts to do so. The engineer's duties under such circumstances are complex, he must think and that takes time."

So in McGee v. Wabash R. R. Co., 214 Mo. 530, 114 S. W. 33, referring to the train running 400 feet in five and one-half seconds, and the duty of the fireman, as it was claimed, to have seen the peril of decedent and to have warned the engineer in time to have avoided the accident, our Supreme Court has said (l. c. 543): "How are those mere pulse beats to be distributed between the engineer and fireman in meting out praise and blame and arriving at actionable negligence? . . . Courts being eminently practical tribunals in getting at practical and just results in

the affairs of men, will it do to chop logic and predicate actionable negligence on subtle reasoning involving metaphysical features and covering an interval of half a second or one or two seconds of time? We think not.''

As has been truly observed in these and many cases, engineers are but human beings. They, as well as the wayfarer upon the tracks, are entitled to be judged by the laws governing human actions. When as here appears, this unfortunate engineer of this train, did all that was possible to avoid the accident when he saw its imminence, shall we hold him responsible— morally, if not pecuniarily—for the death of the decedent? He is human, and we can well believe that the vision of this fatality long lingered with him as a haunting memory, for no one can but deeply feel a death which, however unwittingly, fell in at his hands. Hence we refer to this engineer as unfortunate. A locomotive engineer is charged with great responsibility, not only for the safety of property, but what is of far greater moment, the safety in life and limb of a multitude of human beings. His calling requires constant watchfulness, extraordinary care and these the law requires of him. While in the course of his duty he is often required to act on the instant, the law does not hold him guilty, if in that instant he errs. He is only required to do the very best he can under the surroundings as he sees them.

Shall we judge his act by that act as it looks to us in our calm review of its attendant circumstances, and looking back at it, say that it was a negligent act because we can now say, in the light of those circumstances as they appear to us, it could have been avoided? That is not the law. The act of the engineer is to be judged, not from the circumstances as the jury sees them, but from how they must have appeared to him at the time—he looking at them as a reasonable man. It is true that if damages are here allowed, they will

fall upon the defendant railroad corporation, but the effect of such a finding will be to throw the blame and guilt of taking a human life on the engineer, in effect to hold that under the circumstances, as he saw them, he could have saved that life. We do not think that the evidence here warrants any such result.

As has been said by our Supreme Court in McGee v. Wabash Railroad Co., supra, (l. c. 543) "to get to the jury, plaintiffs must get their case out of the fog of conjecture and plant it on a basis of fact." This the plaintiff failed to do on the issue now on hand. As against the positive testimony of the engineer, who was the plaintiff's own witness, and barring the passenger on the train, the only eyewitness to the immediate event, we have nothing but conjectures raised by the testimony of Mr. Evers. A verdict cannot rest on this mere conjecture.

Our conclusion is that this case falls within what has been determined by our Supreme Court in Guyer v. Missouri Pacific Ry. Co., 174 Mo. 344, 73 S. W. 584; Mockowik v. Kansas City, St. J. & Council Bluffs R. R. Co., 196 Mo. 550, 94 S. W. 256; King v. Wabash R. R. Co., 211 Mo. 1, 109 S. W. 671; Burge v. Wabash R. R. Co., 244 Mo. 76, 148 S. W. 925, and cases hereinbefore cited, in that it clearly appears that the decedent moved from a place of safety into a place of danger so quickly that the engineer, not seeing him change from that place of safety into one of danger until too late to avoid the accident, neither he nor this defendant can be held liable.

The action of the trial court in overruling the demurrer to the evidence was wrong, and its action in setting aside the verdict and granting a new trial for that error is correct and is affirmed. The cause is accordingly remanded to that court for such further proceedings as are in accordance with this opinion. *Allen, J.,* concurs. *Nortoni, J.,* dissents and deeming it in conflict with the opinion of the Supreme Court in

Buesching v. The St. Louis Gaslight Co.; 73 Mo. 219; Rollison v. Wabash R. R. Co., 252 Mo. 525, 160 S. W. 994, and Eppstein v. Mo. Pac. Ry. Co., 197 Mo. 720, 94 S. W. 967, asks that the case be certified to the Supreme Court, which is accordingly done.

## DISSENTING OPINION.

NORTONI, J.—I dissent from the opinion of the court in this case for the reason that it seems to me to ignore material facts in the record; and also that sound principles of law are not adhered to in dealing with the facts as stated. As I understand the facts in proof, there is sufficient to send the issue to the jury as to whether or not defendant's engineer might have given decedent a warning of the approach of the train in sufficient time to enable him to save himself, though the train could not be stopped. Of course, it is conceded the train could not have been stopped in time to have saved plaintiff's husband but under the authority of Eppstein v. Railroad, 197 Mo. 720, 94 S. W. 967, the duty devolved upon defendant to exercise ordinary care for the safety of one seen in a position of danger, and if it could not stop the train, such duty at least called for the sounding of alarms in due time to enable the decedent to make an effort to get out of the way if possible and thus save himself from injury.

The train was approaching a public crossing where the duty rested with defendant to look out for pedestrians. According to the testimony of the engineer, Maginnis was seen while on the sidewalk, walking northward toward the track. But the engineer says when about three feet north of the northeast corner of Evers' store he left the sidewalk and started across Berry road to the east, as though he was going to the small station house situate on the south side of the railroad track, and thus did not appear to be moving

into the danger zone. The danger zone, in a case of this character, with a passenger train running from forty to forty-five miles an hour, is not only on the track itself but must include a considerable space on either side, for, as one of the witnesses says, he would not like to take his chances on being within ten feet of a passing train at such speed. [See, too, Graney v. Railroad, 140 Mo. 89, 41 S. W. 246; s. c. 157 Mo. 666, 57 S. W. 276.] But this is unimportant at the moment.

If Maginnis, who was seen by the engineer to be walking northward and toward the track on the plank sidewalk on the west side of Berry road, left the walk within three or four feet of the northeast corner of Evers' store and started across the road to the eastward, toward the station, which the evidence shows stood seventeen feet south of the south—that is, the eastbound—railroad track, and then, upon reaching the east side of Berry road, suddenly turned to the northward and ran upon the track, as Mr. Hayes, the locomotive engineer, says he did, then it is entirely clear that the case should not have been submitted to the jury, for in such circumstances the time was too short to have given even a warning which would have availed the end desired; but there is evidence in the record, other and distinct from this, and such evidence, to my mind, is thoroughly contradictory of that given by the engineer. On the former appeal, engineer Hayes testified on the part of defendant, but on the last trial plaintiff put him on the stand, and this seems to confuse the issue more or less. But, obviously, plaintiff is entitled to the most favorable view of the evidence in the case, and this is true though the evidence of one witness appears to be contradictory to another. Such is expressly ruled in Rollison v. Wabash R. R. Co., 252 Mo. 525, 160 S. W. 994.

There is evidence on the part of plaintiff tending to prove that Maginnis was on the plank walk pass-

ing north on the west side of Berry road and walking toward the railroad track at the point where the engineer, Hayes, says he saw him toward the east side of Berry road opposite the sidewalk north of the track. He came upon the railroad track at the west end, or southwest corner, of the plank wagon road crossing. The wagon road crossing consisted of planks lying lengthwise with the railroad, sixteen feet in length. There is an abundance of evidence tending to prove that Maginnis' footprints were traced from where he entered upon the track at the southwest corner of this crossing and walked or ran the full length of the crossing—that is, sixteen feet to the northeastward on the track—where the engine ran upon him, at the northeast corner of the crossing—that is, adjacent to the north rail of the track—when he was in the very act of stepping off of it. There is evidence, too, as I understand the record, that there were footprints between the end of the plank sidewalk, where Maginnis was seen walking near Evers' store, and the crossing. The witness Evers says, speaking of the footprints, which, at the former trial, he said he could identify by a break in Maginnis' shoes, but on the last trial remembered only a break in one shoe—that is, the left shoe—"that we found at least a half dozen—that is, from the plank walk up." As I understand this evidence, it refers to the space between the end of the plank walk on which decedent was seen walking and the point at which he entered on the railroad crossing at the southeast corner of such crossing. The witness says "We found at least a half dozen [footprints]. That is from the plank walk up." It is true he was testifying theretofore about finding a number of footprints on the cinders just west of the crossing boards and on the crossing which he identified as those of Maginnis because they revealed a break in the left shoe, and such a break appeared in the left shoe worn by decedent at the time. The engineer is authority

for the fact that Maginnis was walking north on the sidewalk. The usual course for one to pursue, in such circumstances, to enter upon the railroad track at the point where Maginnis' shoe-prints show he entered—that is, the southeast corner of the road crossing—would be to follow the board walk to the end, and then turn across a few feet to the northeast, to where he went upon the track.

The evidence seems to be conclusive that decedent was run upon and killed on the northeast corner of the crossing and that he had walked at least sixteen feet on the track—the full length of the crossing—before the collision occurred. If he was seen by the engineer near Evers' store while walking on the sidewalk—and the corner of Evers' store is only fifty-seven feet south of the railroad track—and then entered upon the track at the southeast corner of the crossing, as this evidence reveals, the locomotive engineer appears to have been remiss in his duty in not sounding an alarm before he did.

The engineer testifies that he sounded the alarm to warn Maginnis of the approach of the train when the locomotive was within forty, sixty, or seventy-five feet of him and the train was running from forty to forty-five miles per hour. The plaintiff is entitled to the most favorable estimate given here by the engineer, for, in determining the question as to whether a prima-facie case was made, not only all reasonable inferences in favor of plaintiff's case must be allowed to her and all reasonable inferences in favor of defendant rejected, but the most favorable view of the evidence as well. Such is the established rule of decision, as we understand it. [See Buesching v. Gaslight Co., 73 Mo. 219.] The engineer admits seeing plaintiff when he was near Evers' store on the sidewalk and says he had his eye on him all the time thereafter. If this is true, then, obviously, the locomotive, running at forty or forty-five miles per hour, must have been

from 1200 to 1500 feet to the westward of the crossing when Maginnis was first discovered by the engineer, for Maginnis traveled either sixty feet, on plaintiff's theory, or more than eighty feet, on the engineer's theory, before he came to his death. This being true, if Maginnis was headed toward the crossing, as the footprints in evidence tend to show, the law devolved the duty on the engineer to sound a warning signal of the approach of the train as decedent neared the track apparently oblivious of danger. The engineer says he did not do this until—allowing plaintiff the most favorable view of the evidence—within forty feet of the point of collision.

There can be no doubt that the overwhelming evidence goes to the effect, indeed, if it is not conceded, that the decedent was run upon at the northeast corner of the road crossing proper—that is, on the east end of the north plank of the crossing. If this be true, then, according to the evidence of Butterworth, defendant's civil engineer, who made measurements for defendant but testified respecting them at the instance of plaintiff, Maginnis came to his death eleven feet west of the point that the engineer says that he entered upon the track, and if this be true, then the evidence showing Maginnis to have come on the crossing at the southwest corner of it and running lengthwise of the crossing to the northeast corner, where the locomotive ran upon him, is squarely contradictory to the evidence given by the locomotive engineer, to the effect that he came upon the track on the east side of Berry road, but suddenly turned towards it immediately opposite the sidewalk on the east side of Berry road, which ran from the railroad track north.

In this connection it is to be said the railroad tracks ran east and west, or practically so, while Berry road runs north and south, or practically so. Berry road is forty feet wide. On the east side of Berry road and north of the railroad track a sidewalk had

been constructed, while the walk on the south side of the railroad track was along on the west side of Berry road and in front of Evers' store. Evers' store stood fifty-seven feet south of the south rail of the eastbound railroad track and such was the south track. The locomotive and train was eastbound. Evers' store, the record reveals, was forty-two feet in length, but immediately in the rear of it there stood a signboard twelve feet high and sixty-four feet long, and such was flush with the side of the store; then, too, a number of trees were scattered along to the westward. Evers' store did not stand east and west, however, parallel with the railroad, but rather stood diagonally with respect to the railroad tracks. In the record on the former appeal it was said the west end of Evers' store stood within twenty inches of defendant's right of way, while in the evidence in the present record it is said the west end of Evers' store is about a foot from the south line of defendant's right of way. It appears, too, that the east end of Evers' store stood about twenty-two feet south of defendant's right of way. So it is, the rear end of the store tended to obstruct the view of one looking from the sidewalk westward to the railroad track. In the former case, Evers testified that he could not see any considerable distance from the plank sidewalk west down the railroad track without walking north from his store up to the railroad right of way line. That would be about twenty-two feet. While that evidence does not appear to be in the present record, defendant's civil engineer, Butterworth, says that one could not have a clear view, after passing Evers' store going northward on the sidewalk, toward the west on the railroad track to exceed probably 500 feet, on passing the corner. This fact in evidence tends to prove that if the locomotive engineer, Hayes, saw plaintiff's husband when he passed the northeast corner of Evers' store, then the locomotive was only about 500 feet westward down the track. If such be true, then, according to the

evidence of Hayes, this old gentleman, the decedent, sixty-nine years old, who he says was running at the time, left the sidewalk there and ran eastward across Berry road to the east side of it toward the station house, which stood seventeen feet south of the track, according to the evidence of Butterworth, and when opposite to the sidewalk north of the tracks, turned immediately and ran upon the railroad tracks. By so doing, according to the measurements of the civil engineer, given in evidence, the decedent would have run between eighty-five and ninety feet across a muddy country road upon the railroad track while the locomotive, running at forty-five miles per hour, ran 500 feet. It is believed that this raises a question for the jury as to whether or not the story is a probable one. Especially is this true in view of the fact that the evidence is quite convincing that Maginnis did not come upon the railroad track at all at the point the locomotive engineer said he did, but was struck and killed on the northeast corner of the crossing boards, near, but to the east side of, the center of Berry road, which point, according to the measurements of the civil engineer, is eleven feet farther west than the place where the locomotive engineer said he came upon the track. Obviously this evidence is contradictory to that given for plaintiff. As before said, the evidence for plaintiff tends to prove that Maginnis, whom the engineer said was running northward on the plank sidewalk on the west side of Berry road when he first observed him, went north and came upon the railroad track at the southeast corner of the planking at the road crossing.

We copy from the record the following questions and answers pertaining to this matter: "Q. Now, did you make any effort there to ascertain the course of Mr. Maginnis or his whereabouts at the time he was struck? A. After the train had left we—several of us went out. It had been raining that night or early morning, and the crossing was muddy. The mud from the

road had got up on the crossing, and if I remember
right there were four planks to each track—that is,
two planks each side of the track, then the broken
places and then two more. We followed his steps on
those planks to the last plank on the—this is, the last
inside plank on this crossing. Q. Near which rail was
that plank? A. The north rail. Q. How were you
enabled to follow his tracks? A. Why, his shoe was
worn through at the sole, and being fresh mud on the
tracks and the rain having beaten it down we could
track him on that mud. Q. How many of those tracks
did you find? A. I don't remember at the present
time what they were. Q. Where was the beginning of
them? A. The beginning of them was right at the
driveway or where the teams had carried the mud along
the cinders. Q. At which end of the crossing? A. The
west end of the planking. Q. The beginning of the
tracks was at the west end of the planking? A. Yes,
sir. Q. Now, show the jury here now—I will ask you
to examine plaintiff's exhibit A, and state if that was a
picture of the crossing boards in there, looking west?
A. Yes, sir, that is the picture. Q. Point out to the
jury there just about these crossing boards where you
saw his track. A. We first noticed his tracks some-
wheres at this point. (Indicating on said exhibit.) Here
is the store. We first noticed his tracks in here some
place, and then they came up along over the rail. He
seemed to first, if I remember correctly, he followed
this rail here. That is northeast, and then crossed
where it was more dry to this—about this point, and
then his—he was struck and it struck him on this
track. My recollection is that the first steps that we
could follow was, just about at this point on the cross-
ing. Q. Which point is that? A. That is the west
point, about even with the west point of the planking,
and he apparently followed the rail over to the north
side on the east side of the roadway. Judge Green:
It wasn't between the rail? A. No, sir—that is my rec-

ollection. The last step was on this plank next to this rail. (Indicating on said exhibit.) Q. That is the north rail? A. North rail near the end of the plank. Q. How close do you think from the end. A. I don't remember now, but it seems to me that he was near the end. . . . Q. Now, to refresh your memory on that, I will ask you if you recollect this question and answer now: 'Q. And you found about how many'—This is by Judge Green—'Q. And you found about how many footprints that in your judgment were those of Mr. Maginnis? A. We found at least a half dozen. That is from the plank walk up.' Does that refresh your memory on that? A. That is evidently correct at that time; yes, sir. My memory was more distinct than it is at present. Q. You think that was a correct statement at that time? A. I do; yes, sir."

It is true that a number of questions and answers above copied relate to the tracks of Maginnis at and about the road crossing, for such was the subject-matter to which the witness' attention was then being directed. But the last question and answer, as follows—"Q. And you found about how many footprints that in your judgment were those of Mr. Maginnis? A. We found at least a half dozen. *That is from the plank walk up*"—apparently relate to probably twenty-five feet of open space between the end of the plank walk and the southwest corner of the road crossing. At any rate, this evidence indicates that there were footprints made by Maginnis "from the plank walk up." This bit of evidence does not seem to be mentioned in the majority opinion, and it is said therein that the evidence of Evers with respect to footprints seems to be entirely as to footprints appearing at and about the crossing. In my judgment this is invading the province of the jury, for the jury are to allow every reasonable inference in favor of plaintiff when the question of a *prima-facie* case is being considered and at the same

time reject the inferences favorable to defendant. [See Buesching v. Gaslight Co., 73 Mo. 219.]

Further on in the testimony, these questions and answers appear: ''Q. You found indications that Mr. Maginnis had probably stepped on the edge of the crossing boards here and had continued diagonally across towards the north rail, did you? A. Yes, sir.'' . . . The witness also says: ''The break, I remember very distinctly, was in the left shoe, for the reason that we had an argument—.'' And the witness says at another place the footprints that they found and of which he spoke were footprints made by a left shoe containing such a break. The question and answer concerning this are as follows: ''Q. Did you find any footprints corresponding to that foot from which that shoe was? A. I certainly did; yes, sir. Q. The prints were footprints of the left foot? A. Yes, sir. . . . By Mr. Arnold (Q.): Will you let me ask him one question? The footprints you speak about, were they on the crossing boards between the rails of the track or were they on the crosswalk south of the track? A. *Part of them, if I remember was on the planking and part of them was off of the planking on the mud that was on the roadway. Q. Mud on what? A. Mud on the cinders. Q. Where was that mud on the cinders, east or west of the crossway? A. The mud, in driving the wagons would naturally bring the mud up, probably twenty feet wide there.*'' Further on, the witness says, in speaking of these footprints about the crossing, as follows: ''Q. *At which end of the crossing boards? A. At the west side of Berry road.* Q. Now, there is one photograph here which shows a crosswalk down here. This crossing—this sidewalk that runs in front of your store there, you didn't find any prints there? A. No, we couldn't on the plank. Q. No footprints on that plank walk that runs in front of your store? A. No. The Court: Does that answer your question, Mr. Juryman? I think he wants the witness to inform him

where those footprints were concerning which he testified. The Juryman: That is what I want. By Mr. Arnold (Q.): Answer that question. Tell us on the photograph. The Court: Hold it up so that the jury can see it. A. (Indicating on photograph): The footstep we started to trace from was on this planking if I remember correctly, and running from there on down to this point in here. The Juryman: *Diagonally?* A. If I may be allowed to explain? The front of my store stands about twenty-one feet from the right-of-way. It is forty-two feet back—it comes to within probably a few inches of the right-of-way, so that the road would run diagonally or probably a fifty per cent slope there, wouldn't it? By Mr. Arnold (Q.): You mean above your store? A. *No, my store stands in here and the road practically is out there, and then my store goes directly to the west, and the track goes off here, so that in coming out we have to look down in that direction.* Q. This blue print shows it (handing same to witness)? A. Yes, sir. Q. Point out the store on the blue print. A. Right here. *There is something like twenty-one feet from the store here to the right-of-way. When we get to the rear of the store you see it is within a few inches.* . . . Q. Let me ask this one question. The first footprints that you found— A. Was along about where that white line is. Q. About here? A. I should judge so. Q. *That is west of the west end of those crossing planks?* A. *Yes, sir.* Q. *Which direction were they leading?* A. *Headed toward this walk over here.*"

When these questions and answers are read all together, it appears to indicate that decedent came upon the track at the west end of the crossing planks, and the crossing is nearly about the center of Berry road —that is, at the southwest corner of the wagon road crossing,—and the last answer quoted says that he was headed toward this walk over here—*that is, to the*

190MA36

*northeast toward the sidewalk on the east side of Berry road, but north of the railroad track.* The line west of that sidewalk, according to the measurements of the civil engineer, was eleven feet east of the east end of the wagon road crossing. It is certain that Maginnis was seen on the sidewalk going northward toward the railroad, for the engineer says he first observed him running there, but says he had only passed the corner of Evers' store. However, when it is remembered that Evers' store stands diagonally with the railroad and that the rear or west end of it protruded within a few inches of the right-of-way, while the east end of it was about twenty-one or twenty-two feet south of the right-of-way line, it would seem that Maginnis had passed considerably north of the northeast corner of Evers' store on the sidewalk before the engineer could have seen him at the distance which he must have been from decedent at the time. Manifestly so, for on plaintiff's theory of the case, Maginnis passed up the sidewalk and diagonally to the southwest corner of the road crossing, a distance of about forty feet, and then walked or ran as much as sixteen feet on the crossing to the northeastward with his back toward the oncoming engine, before the collision; while, according to the testimony of the locomotive engineer, decedent left the sidewalk, ran across Berry road toward the station standing seventeen feet south of the railroad track on the east side of Berry road, and then turned abruptly upon the track. If this theory is true, then Maginnis came upon the track eleven feet east of the point where he was run upon by the locomotive engine, and the crossing boards being sixteen feet in length, he came upon the track twenty-seven feet further east than plaintiff's evidence tends to reveal the fact to be. There can be no doubt as to what the testimony of the engineer, Hayes, is in respect of this matter, for it is plain, pointed and positive. Engineer Hayes testifies as follows, concerning this matter: "Q. Just as soon as you

saw him running, did you give him a signal then? A. After I thought there might be a possibility of danger I gave him a double warning. I thought then he diverted his course straight across. Q. What course did he pursue until he was struck there? A. He left the sidewalk near Mr. Evers' store and started diagonally across the roadway, that is the wagon roadway, for the depot, diagonally across. Q. He appeared to be running towards the station there? A. Going towards the station. I suppose possibly one or two steps after he left Evers' store he left the sidewalk and then started diagonally across towards the station. Q. Now, take this Plaintiff's Exhibit A here. That is a picture looking west, Mr. Hayes. Where did the deceased enter the track—at what point did he enter the track? A. At what point did he cross the track when he first came on the track? Q. Yes, sir. A. This picture isn't plain enough to testify this. But I can explain it so that anybody that has been there can understand it. As near as I can tell he entered what would be this cinder path here in front, *about even with this crossing plank on the north side.* It might have been a little bit east (indicating on said exhibit). Q. *You refer to the walk north of the track?* A. *To the walk north of the track.* Q. Let's take this blue print. Maybe that will help us better. Just look at that now, first, so that you get your bearings on that. A. I have got them all right. Q. Now, take this pencil now and indicate to the jury the station house on the blue print. A. Here is the station house here—that is the depot. Q. Now, indicate there to the jury—*indicate the north walk plank road.* A. *On the east side of Berry road?* Q. *North of the tracks?* A. *Yes, sir.* Q. Those represent crossing boards, do they? A. Yes, sir. Q. Indicate to the jury the way he entered, stepped over the south rail of the track. A. *As near as I can tell he stepped over about directly even with this board walk.* This cinder walk comes along here up to this crossing and he went

from here, *from the corner of the store diagonally across here, to as near as I can tell even with that walk, and then diverted his course directly north across the tracks.''* This evidence is pointed and direct as to where the engineer said Maginnis came upon the track. It appears to be, in accordance with the civil engineer's measurements, eleven feet east of the east end of the crossing—that is, east of where Maginnis was when he was run upon according to the burden of the evidence. It is also twenty-seven feet east of the point where plaintiff's evidence tends to show he came upon the track. However, the majority opinion proceeds in the view that there is no contradiction whatever between the testimony of Evers as to where decedent came upon the track and that of the locomotive engineer, Hayes. Obviously there is such a contradiction, and it appears to me to be a question for the jury as to which theory was correct. If decedent followed north on the board walk, as his tracks would seem to indicate, then he was approaching the track oblivious of danger under the very eye of the engineer while he covered a space of as much as forty feet, before reaching it, and having reached the track he walked or ran sixteen feet to the northeastward on it—that is, on the crossing. In this view it would seem that the precepts of ordinary care required the locomotive engineer to sound an alarm or give him some signal of warning before coming within forty feet of the point of collision. [See Eppstein v. Railroad, 197 Mo. 720, 94 S. W. 967.] The engineer says he gave no alarm until within forty, sixty, or seventy-five feet of decedent, and the plaintiff is entitled to the most favorable statement here and that is forty feet. But say he did not give the alarm until within seventy-five feet of decedent, it would seem if the train were running from forty to forty-five miles per hour, as the engineer says it was, when a man is seen to be running, and oblivious of the approaching train, toward the track on a public road

crossing, it would appear he should have a signal of warning before the train came within seventy-five feet of him. *At any rate, it is believed this is a question for the jury.* In respect of this matter, it is immaterial whether there are any footprints between the end of the plank walk on which Maginnis was when the engineer first saw him and the southeast corner of the wagon crossing on the railroad or not, for the evidence is abundant that there were footprints immediately west and at the southwest corner of the road crossing tending to show where he came upon the track and that he walked or ran upon the track the whole length of the crossing until he was run upon. This itself is highly contradictory of the engineer's version that he ran almost straight across the roadway and then suddenly diverted his course to the north when immediately opposite to the sidewalk on the north side of the track, which appears to be eleven feet east of the point where he was run upon. In this view, it is believed the case is one for the jury to answer where Maginnis started upon the track and where he came within the danger zone. However, it is insisted that there is a scrap of evidence in the record going to show footprints between the end of the plank walk and the southwest corner of the road crossing and such evidence, as before pointed out, is as follows: "Q. And you found about how many footprints that in your judgment were those of Mr. Maginnis? A. *We found at least a half dozen. That is from the plank walk up.*" In connection with this question and answer, it is to be said that the only plank walk referred to by this witness in disclosing the footprints and in the general tenor of his testimony was the plank walk which ran north in front of Evers' store on the west side of Berry road and extended for some ten feet upon the right-of-way—the same plank walk upon which the locomotive engineer says Maginnis was when he first observed him. This was for the consideration of the jury, especially in

view of all the circumstances shown in the record. But it is to be repeated, whether this scrap of evidence be considered or not, there is an abundance of evidence that decedent came upon the railroad track at the southeast corner of the road crossing and either walked or ran on the crossing the full length of it when he was run upon. This, when considered together with the fact that he was observed by the engineer some fifty feet distant from the road crossing on the side-walk, is sufficient, in my judgment, to send the case to the jury on the theory that decedent came upon the track where the footprints are said to show that he did and that he ran or walked that distance after being seen by the engineer on the plank walk and under the very eye of the engineer apparently oblivious of the approaching train, and if such facts be true, it would appear the engineer was remiss in his duty in not sounding a warning before coming within forty, sixty or seventy-five feet of the point of collision. Of course, if we are to take the testimony of the engineer alone that Maginnis left the plank walk and went east across Berry road and suddenly turned north upon the track immediately opposite the sidewalk on the north side, which, as before said, was eleven feet east of where the evidence shows the collision occurred, then the case should not have gone to the jury.

The opinion of the court seems to overlook entirely the question of the various measurements and distances detailed in the evidence by the civil engineer and also the situation of Evers' store, the signboard, and the trees and their tendency to obscure the view from a locomotive running from the westward. The evidence appears to be quite convincing that the loco-motive engineer could not have seen Maginnis when three feet north of the northeast corner of Evers' store because the rear end of the store and the signboard and the growing trees obstructed the view from any point that the locomotive engineer might have occupied

on a train approaching at forty or forty-five miles per hour, when the distance that the decedent must have covered in the meantime is considered—that is, about fifty-five feet to the southeast corner of the crossing, according to plaintiff's theory, or more than eighty feet, according to the theory of the engineer—before coming upon the track. *If Maginnis ran eighty feet after the engineer observed him, at the rate the train was going, it appears the train must have been a considerable distance to the westward—probably a quarter of a mile—and this is a matter for the jury to consider.* On the other hand, it seems to be more probable that decedent followed the course which plaintiff's evidence tends to prove—that is, that he traversed about fifty feet to the point of collision along the route suggested by the plank walk, or it may be by leaving the walk and in the wagon road, to the southwest corner of the crossing where his footprints appear, for, evidently, when the obstruction of and to the rear end of Evers' store is considered, it would seem plaintiff's husband could not be more than fifty feet away from the place of his death when first observed. This is quite clear, for, when these obstructions are considered, the engineer could not see him until he had passed to the north of the store some twelve to fifteen feet. The civil engineer says one cannot see westward on the railroad tracks on passing Evers' corner more than 500 feet. In my judgment, the case was one for the jury when all of the facts are considered, togther with the measurements, the obstructions to view and the location.

I deem the opinion of the court to be in conflict with the decision of the Supreme Court in Buesching v. Gaslight Co., 73 Mo. 219, in that it rejects competent inferences from the evidence in favor of a prima-facie case for plaintiff and utilizes inferences from such evidence to the contrary. I deem it to be also in conflict with the decision of the Supreme Court in

Rollison v. Wabash R. Co., 252 Mo. 525, 160 S. W. 994, for the reason that it rejects the evidence shown in the footprints and the fact that the engineer saw Maginnis on the walk running toward the track, as by overcoming it and annihilating its probative force through adopting the evidence of Hayes, the engineer, and in holding that it is in nowise contradictory thereto when it appears from Hayes' statements that decedent came upon the track at a point about twenty-seven feet east of where plaintiff's evidence shows he came upon it. I deem the opinion of the court to be in conflict, too, with the decision of the Supreme Court in Eppstein v. Mo. Pac. R. Co., 197 Mo. 720, 94 S. W. 967; Reyburn v. Mo. Pac. R. Co., 187 Mo. 565, 86 S. W. 174, and other cases of that character, which declare the rule that, though the train may not be stopped, ordinary care requires a warning signal to be given by the locomotive engineer to one approaching the track at a public crossing, or where an user obtains, who appears to be oblivious of the oncoming train.

Entertaining this view, I respectfully request that the case be certified to the Supreme Court for final determination, in accordance with the mandate of the Constitution.